UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

--------------------------------------------------X

NATIONAL CASUALTY COMPANY,

          Petitioner,

              v.

FIRST STATE INSURANCE GROUP,

          Respondent.

--------------------------------------------------X

Civil Action No.: 04-10167MLW

## RESPONDENT FIRST STATE INSURANCE GROUP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS NATIONAL CASUALTY COMPANY'S PETITION TO VACATE ARBITRAL ORDER

First State Insurance Group
By its attorneys,

Mitchell S. King, Esq. (BBO#2728107)
Thomas M. Elcock, Esq. (BBO #548027)
Prince, Lobel, Glovsky & Tye LLP
585 Commercial Street
Boston, Massachusetts 02109
(617) 456-8000

-and-

Lawrence S. Greengrass, Esq.
Lloyd A. Gura, Esq.
Todd A. Bakal, Esq.
Sanjit Shah, Esq.
Mound, Cotton, Wollan & Greengrass
One Battery Park Plaza
New York, NY 10004
(212) 804-4200

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES................................................................................. ii

PRELIMINARY STATEMENT......................................................................... 1

FACTS........................................................................................................... 3

ARGUMENT.................................................................................................. 6

    POINT I

        THIS COURT MAY NOT REVIEW THE DECISION
        OF THE PANEL BECAUSE THE ARBITRATION ORDER
        ADDRESSES ONLY PROCEDURAL QUESTIONS.............................. 6

    POINT II

        THE PETITION SHOULD BE DISMISSED BECAUSE THE
        ARBITRATION ORDER IS NOT A FINAL AWARD AND
        THEREFORE, MAY NOT BE REVIEWED BY THIS COURT............... 11

    POINT III

        EVEN IF THE ARBITRATION ORDER WERE A FINAL
        AWARD, AND IT IS NOT, THERE WOULD BE NO
        GROUNDS FOR ITS VACATUR UNDER THE FEDERAL
        ARBITRATION ACT...............................................................12

        A.     The Privileged Documents Are Irrelevant................................. 12

        B.     The Panel Did Not Engage in Misconduct................................14

    POINT IV

        THE PETITION SHOULD BE DISMISSED AS MOOT
        BECAUSE THE ARBITRATION HAS BEEN CONCLUDED............... 15

CONCLUSION....................................................................................16

## TABLE OF AUTHORITIES

### CASES

Banco de Seguros del Estado v. Mut. Marine Office, Inc.,
344 F.3d 255 (2d Cir. 2003)............................................................... 9, 14

Commercial Union Ins. Co. v. Swiss Reins. Am. Corp.,
No. Civ. A. 00-12267-DPW, 2003 WL 1786863
(D. Mass. Mar. 31, 2003)...............................................................13, 14

Davidson v. Stanley, No. Civ. 02-190-JD,
2003 WL 21785112 (D.N.H. Aug. 4, 2003) .....................................................15

First Preservation Capital, Inc. v.
Smith Barney, Harris Upham & Co.,
939 F. Supp. 1559 (S.D. Fla. 1996)...........................................................10 n.4

Fradella v. Petricca, 183 F.3d 17 (1st Cir. 1999)................................................. 11

Green Tree Financial Corp. v. Bazzle, ___ U.S. ___,
123 S. Ct. 2402 (2003)...................................................................6-7

Hart Surgical, Inc. v. UltraCision, Inc.,
244 F.3d 231 (1st Cir. 2001)...............................................................11

Hooters of Am. v. Phillips, 173 F.3d 933 (4th Cir. 1999)....................................... 9

Hoteles Condado Beach, La Concha and Convention Ctr.
v. Union de Tronquistas Local 901, 763 F.2d 34 (1st Cir. 1985).............................10

Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79,
123 S. Ct. 588 (2002)...................................................................6, 7, 9

Nationwide Mut. Ins. Co. v. First State Ins. Co.,
213 F. Supp. 2d 10 (D. Mass. 2002)...........................................................11

New York Times Co. v.
Newspaper and Mail Deliverers Union of New York and Vicinity,
740 F. Supp. 240 (S.D.N.Y. 1990)...........................................................10 n.4

PaineWebber Inc. v. Elahi, 87 F.3d 589 (1st Cir. 1996)....................................7, 9

Prozinski v. Northeast Real Estate Servs., LLC,
59 Mass. App. Ct. 599, 797 N.E.2d 415 (2003)................................................8

Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,
217 F.3d 8 (1st Cir. 2000) ……………………………………………………………8

Shaw's Supermarkets, Inc. v.
United Food and Commercial Workers Union, Local 791,
321 F.3d 251 (1st Cir. 2003)……………………………………………………………7

Travelers Cas. & Sur. Co. v.
Gerling Global Reins. Corp. of Am.,
285 F. Supp. 2d 200 (D. Conn. 2003)…………………………………………… 13, 14

Vimar Seguros y Reaseguros, S.A.
v. M/V Sky Reefer, 29 F.3d 727 (1st Cir. 1994),
aff'd, 515 U.S. 528, 115 S. Ct. 2322 (1995)……………………………………………8

Williams v. HealthAlliance Hosps., Inc.,
158 F. Supp. 2d 156 (D. Mass. 2001)…………………………………………… 8

## STATUTES

9 U.S.C. § 10…………………………………………………………………………11, 12

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

-------------------------------------------------X

NATIONAL CASUALTY COMPANY,

                     Petitioner,

          v.

FIRST STATE INSURANCE GROUP,

                     Respondent.

-------------------------------------------------X

Civil Action No.: 04-10167MLW

### RESPONDENT FIRST STATE INSURANCE GROUP'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS NATIONAL CASUALTY COMPANY'S PETITION TO VACATE ARBITRAL ORDER

Respondent First State Insurance Group ("First State") submits this memorandum of law in support of its motion, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, to dismiss National Casualty Company's ("National Casualty") Petition to Vacate Arbitral Order and Enjoin Further Arbitral Proceedings, Or, in the Alternative, Remand.

### PRELIMINARY STATEMENT

The instant Petition (the "Petition")[1] is nothing more than an impermissible attempt to embroil this Court in a discovery dispute that has arisen in the course of an on-going arbitration between First State and its reinsurer, National Casualty. During the arbitration, the arbitration panel (the "Panel") rendered a decision dated November 15, 2003 ordering First State to produce certain documents protected from disclosure by the attorney-client privilege and the work-product doctrine (the "November 15, 2003 Order"). The November 15, 2003 Order further provided that if First State did not produce the documents, the Panel would draw "whatever negative inferences [it deemed] appropriate in the presentation of First State's position in this matter."

---

[1]     A true and correct copy of the Petition is annexed hereto as Exhibit A.

First State decided to accept the possibility of a negative inference rather than produce the documents in view of case law holding that an insurer's disclosure of privileged documents to its reinsurers may result in a waiver of the privilege with respect to third parties, including its insureds. By order dated December 5, 2003 (the "Arbitration Order") the Panel deferred ruling on the potential consequences of First State's non-production until the arbitration hearing. Frustrated by its inability to obtain privileged documents that have absolutely no relevance to the matters to be decided, National Casualty now petitions this Court to vacate the Arbitration Order. National Casualty's Petition is entirely without merit, and should be dismissed for several reasons.

First, the United States Supreme Court has unequivocally held that in an arbitration, questions of procedure are to be decided by the arbitrator, not a judge. According to this precedent, as well as case law from the First Circuit, a court may only resolve questions concerning the arbitrability of a dispute. Because the Arbitration Order concerns only such procedural discovery matters as the consequences of a party's withholding of documents, the Petition fails to state a claim, and should be dismissed with prejudice.

Second, only a final arbitration decision, not an interlocutory one, may be reviewed by this Court. Here, the Arbitration Order is not final because it does not resolve a claim submitted in the demand for arbitration. Accordingly, National Casualty cannot challenge the Panel's decision, and its Petition should be dismissed.

Third, although a final award may be vacated where the arbitrators improperly refused to hear evidence pertinent and material to the controversy, the privileged documents that are the subject of the Arbitration Order have no relevance whatsoever to the instant arbitration. Consequently, even after a final award is rendered, National Casualty could not move to vacate the award on the ground that the arbitrators refused to "hear evidence pertinent and material to the controversy" under section 10(a)(3) of the Federal Arbitration Act.

Moreover, the Panel's decision to defer ruling on the potential consequences of First State's non-production until the hearing cannot, as National Casualty contends, under any

2

circumstances be considered misconduct by the arbitrators. Under the express terms of the reinsurance treaties, the Panel has broad discretion to craft appropriate remedies for the parties' conduct during the arbitration. What National Casualty really objects to is the Panel's decision not to impose a greater sanction on First State for not producing the documents. This is not a basis for vacating an award under the Federal Arbitration Act.

Finally, the arbitration hearing between First State was commenced on February 10, 2004 and has now been concluded. The Petition is therefore moot, and should be dismissed as such.

## FACTS[2]

The dispute between First State and National Casualty involves National Casualty's failure to honor its obligations under certain reinsurance treaties pursuant to which it agreed to reinsure First State for losses arising from various products liability, asbestos and environmental claims (collectively, the "Treaties"). The Treaties provided that the settlements made by First State were unconditionally binding on National Casualty:

> All loss settlements made by the Reinsured, provided they are within the conditions of the Reinsured's original policies and within the terms of this Contract, shall be unconditionally binding upon the Reinsurer and the Reinsurer's share shall be payable at the same time and in the same manner as the Reinsured may elect to pay, upon reasonable evidence of the amount paid or to be paid being given by the Reinsured.

(Fourth Casualty Excess of Loss Reinsurance Contract between National Casualty and First State, annexed as Exhibit 1 to the Petition, at Article XI, ¶ 2.)[3]

---

[2]    First State accepts the Petition's factual allegations as true only for the purposes of this motion.

[3]    The Second and Third Casualty Excess of Loss Treaties between First State and National Casualty, annexed as Exhibits 2 and 3 respectively to the Petition, have similar provisions concerning loss settlements. The only difference is that the phrase "within the conditions of the Reinsured's original policies" is omitted from Article XI, paragraph 2 of the Second and Third Casualty Excess of Loss Treaties.

First State commenced the instant arbitration against National Casualty by filing a demand for arbitration dated May 9, 2002. The Treaties require that any dispute between the parties be arbitrated, and provide that the arbitrators are not obliged to follow strict rules of law:

> If any dispute shall arise between the Reinsured and the Reinsurer, either before or after the termination of this Contract, with reference to the interpretation of this Contract or the rights of either party with respect to any transaction under this Contract, the dispute shall be referred to three arbitrators, one to be chosen by each party and the third by the two so chosen. . . . The arbitrators shall consider this Contract an honorable engagement rather than merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law. The decision of a majority of arbitrators shall be final and binding on both the Reinsured and the Reinsurer.

(Fourth, Second and Third Casualty Excess of Loss Treaties, annexed to the Petition respectively as Exhibits 1, 2 and 3, at Article XVI, ¶ 1.)

During the course of the arbitration, the parties engaged in discovery, including document production and depositions. Among the documents that First State declined to produce were privileged attorney-client communications and documents constituting attorney work-product (the "Privileged Documents"). With respect to the Privileged Documents, First State provided to National Casualty and the Panel a privilege log identifying and describing the withheld documents. (First State's Privilege Log, annexed as Exhibit 5 to the Petition.) First State was reluctant to produce the Privileged Documents in view of case law holding that an insurer's disclosure of privileged materials to its reinsurers may result in a waiver of the privilege with respect to third parties, such as First State's policyholders.

National Casualty advised the Panel that it disagreed with First State's treatment of certain documents as privileged. (October 24, 2003 letter from Mark C. Kareken to members of the Panel, annexed as Exhibit 6 to the Petition.) Specifically, National Casualty argued that neither the attorney-client privilege nor the attorney work-product doctrine could be invoked by First State "because the reasons for the protections do not apply to National Casualty." (Id. at 2.) In response, First State submitted to the Panel a brief setting forth the reasons why the attorney-client privilege and the attorney work-product doctrine entitled it to withhold the Privileged

4

Documents, and why disclosure of those materials could result in a waiver of the privilege and work-product doctrine.  (First State's Brief in Opposition to National Casualty's Request for Production of Privileged Documents, annexed as Exhibit 7 to the Petition.)

By letter dated November 15, 2003, the Panel directed that First State produce the Privileged Documents by November 20, 2003, or face the possibility of a negative inference:

> The Panel has reviewed and considered the recent correspondence from counsel regarding the issues presented by the discovery of certain documents listed in Petitioner First State's Privilege Log.  With respect to these documents and other issues, the Panel issues the following Order (Mr. Gentry respectfully dissents noting the cases which hold that reinsurers do not have a common interest in the privileged documents):
>
> 1.    Because of their common interest in the resolution of claims made under the treaties in dispute, the Panel orders First State to produce any documents requested by Respondent National Casualty that relate to the handling of the underlying claims and related litigation at issue in this arbitration.  The Panel believes that such production will not waive any such privilege claimed against third parties.  These documents should be produced by November 20, 2003.
>
> In the event the requested documents are not produced, the Panel will, by necessity, be required to draw whatever negative inferences the Panel deems appropriate in the presentation of First State's position in this matter.

(November 15, 2003 Order, annexed as Exhibit 8 to the Petition.)

Determining that "the risk of disclosure of privileged documents . . . far outweighs any risks inherent in the Panel drawing a negative inference in the presentation of First State's position in this matter[,]" First State advised the Panel that it would not produce the Privileged Documents.  (November 20, 2003 letter from Todd A. Bakal to members of the Panel, annexed as Exhibit 9 to the Petition.)  National Casualty objected, and on December 5, 2003, the Panel issued the Arbitration Order, ruling that the arbitration hearing would not be postponed, and the consequences of First State's non-production would be deferred until the arbitration hearing, scheduled for February 10, 2004:

4.    The Panel will consider the negative implications of First State's refusal to comply with the Panel's order to produce the documents in any award issued by the Panel.

5.    The Panel has also reviewed the December 2, 2003, exchange of correspondence from the parties. The Panel believes that further briefing on potential consequences of First State's failure to comply with the Panel's earlier ruling regarding production of documents to which a claim of privilege is attached is not necessary at this time. The Panel has already reserved its right to decide that issue at the hearing scheduled above when it has received evidence sufficient for it to determine what consequences are appropriate.

(Arbitration Order, annexed as Exhibit 11 to the Petition.)

National Casualty commenced this proceeding seeking, inter alia, (a) a declaration that it is entitled to terminate the arbitration agreements set forth in the Treaties; (b) a declaration that the effect of such termination is to end the Panel's jurisdiction; and (c) an order vacating the Arbitration Order pursuant to 9 U.S.C. § 10, and enjoining further arbitral proceedings. The arbitration hearing that National Casualty seeks to enjoin has now been concluded.

## ARGUMENT

### POINT I

### THIS COURT MAY NOT REVIEW THE DECISION OF THE PANEL BECAUSE THE ARBITRATION ORDER ADDRESSES ONLY PROCEDURAL QUESTIONS

The United States Supreme Court has held that although questions of arbitrability, i.e., whether the parties to a dispute have agreed to resolve their differences through arbitration, are to be resolved by the courts, procedural questions that grow out of a dispute are for the arbitrator to decide. Howsam v. Dean Witter Reynolds, Inc., 537 U.S. 79, 84, 123 S. Ct. 588, 592 (2002) ("Thus 'procedural questions which grow out of the dispute and bear on its final disposition' are presumptively not for the judge, but for an arbitrator, to decide.") (quoting John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557, 84 S. Ct. 909, 918 (1964)). See also Green Tree Financial

Corp. v. Bazzle, ___ U.S. ___, 123 S. Ct. 2402 (2003) (vacating judgment of the South Carolina Supreme Court, holding that arbitrators, and not the courts, should decide questions of contract interpretation and arbitration procedures).

Thus, whether an arbitration is time-barred under arbitration rules is a procedural question to be determined by an arbitrator. Howsam, 537 U.S. at 592, 123 S. Ct. at 592 ("[W]e find that the applicability of the NASD time limit rule is a matter presumptively for the arbitrator, not for the judge. The time limit rule closely resembles the gateway questions that this Court has found not to be 'questions of arbitrability.'"). Similarly, the questions of whether an arbitration may proceed as a "class arbitration," or whether separate arbitration proceedings may be consolidated, must also be decided by an arbitrator. Bazzle, 123 S. Ct. at 2407 (class arbitrations); Shaw's Supermarkets, Inc. v. United Food and Commercial Workers Union, Local 791, 321 F.3d 251, 255 (1st Cir. 2003) ("Leaving the decision whether to consolidate the three proceedings in the hands of the arbitrator comports with long-standing precedent resolving ambiguities regarding the scope of arbitration in favor or arbitrability.").

In the instant proceeding, National Casualty would have this Court intervene in an ongoing arbitration to decide the purely procedural question of how to proceed in view of First State's decision not to produce the Privileged Documents. This has nothing whatsoever to do with the arbitrability of the dispute, which has already been arbitrated. Simply put, because there is no question that the parties have agreed to resolve their differences through arbitration, there is no reason for this Court to resolve a procedural question that is better left to the Panel. PaineWebber Inc. v. Elahi, 87 F.3d 589, 599 (1st Cir. 1996) ("Put differently, the signing of a valid agreement to arbitrate the merits of the subject matter in dispute presumptively pushes the parties across the 'arbitrability' threshold; we will then presume that other issues relating to the substance of the dispute or the procedures of arbitration are for the arbitrator.").

Of no avail is National Casualty's tortured argument that "a material breach of the [arbitration] agreement excuses the other party from further performance under the agreement and entitles it to the termination of the arbitral proceeding, or, if the breach is curable and the

party wishes to cure it, to a stay of the proceeding until the completion of the cure." (Petition at 12.)

This argument is fundamentally flawed because First State has not breached the arbitration agreement. Rather, it has complied with all the procedures set forth in the Treaties' arbitration clauses. National Casualty has cited no cases to support the fanciful notion that First State's non-production is tantamount to a breach of the arbitration agreement. First State's decision not to produce the Privileged Documents is an entirely separate matter from its compliance with the terms of the arbitration clauses. Having fully performed its obligations under the arbitration clause (and, indeed, under the Treaties themselves), First State cannot be considered to have breached it.

The cases that National Casualty does cite, i.e., Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 217 F.3d 8 (1st Cir. 2000), and Prozinski v. Northeast Real Estate Servs., LLC, 59 Mass. App. Ct. 599, 797 N.E.2d 415 (2003), do not support the spurious claim that non-compliance with an arbitrator's order breaches the arbitration agreement. Rather, as National Casualty itself concedes, these cases stand for the limited, and unremarkable, proposition that one party's material breach of a contract excuses the other party from further performance of that contract. Ross-Simons, 217 F.3d at 11, Prozinski, 59 Mass. App. Ct. at 610, 797 N.E.2d at 424. As discussed above, First State has not breached the arbitration clause set forth in the Treaties because it has complied with its obligations thereunder. National Casualty should therefore be prohibited from using First State's withholding of the Privileged Documents as an excuse for cavalierly "throwing over" the arbitration agreement. (Petition at 15.)

National Casualty's contention that First State's non-compliance with the November 15, 2003 Order entitles it "to end the arbitration at issue, with prejudice" (Petition at 15), is not only legally erroneous, but also contravenes the strong federal policy favoring arbitration. Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 29 F.3d 727, 730 (1st Cir. 1994), aff'd, 515 U.S. 528, 115 S. Ct. 2322 (1995); Williams v. HealthAlliance Hosps., Inc., 158 F. Supp. 2d 156, 159 (D. Mass. 2001). Under National Casualty's analysis, a party to an arbitration would be able to

end the arbitration any time its adversary did not comply with an order of the arbitrator. Again, National Casualty does not and, indeed, cannot cite any case law to support this fallacious theory.

By relieving the Panel from "judicial formalities," and excusing it from following strict rules of law, the arbitration agreement at issue confers broad discretion upon the Panel to fashion an appropriate remedy for First State's decision not to produce the Privileged Documents. Banco de Seguros del Estado v. Mut. Marine Office, Inc., 344 F.3d 255, 261 (2d Cir. 2003) ("The arbitration clause . . . at issue provided that '[t]he arbitrators shall consider this Treaty an honourable engagement rather than merely a legal obligation; they are relieved of all judicial formalities and may abstain from following the strict rules of law.' Courts have read such clauses generously, consistently finding that arbitrators have wide discretion to order remedies they deem appropriate.") (emphasis in original). Thus, National Casualty is protected by the arbitration clause to which it agreed when it entered into the Treaties, and neither needs, nor is entitled to, this Court's intervention to resolve a purely procedural question. E.g., Howsam, 537 U.S. at 84, 123 S. Ct. at 592; PaineWebber, 87 F. 3d at 599 ("Thus, if the parties have (1) entered into a valid arbitration agreement . . . and (2) the arbitration agreement covers the subject matter of the underlying dispute between them . . . then we will presume that the parties have made a commitment to have an arbitrator decide all the remaining issues necessary to reach a decision on the merits of the dispute.").

Contrary to National Casualty's claim, First State's decision not to produce the Privileged Documents, which as discussed in Point III.A, infra, are irrelevant, does not undermine the integrity of the proceeding or render it unfair or partial. In one case cited by National Casualty, Hooters of Am. v. Phillips, 173 F.3d 933 (4th Cir. 1999), the Court affirmed the district court's denial of a motion to compel arbitration by Hooters, which had "set up a dispute resolution process utterly lacking in the rudiments of even-handedness[.]" Hooters, 173 F.3d at 935. The Court concluded that Hooters had breached the arbitration agreement with its employee because it had promulgated "rules so egregiously unfair as to constitute a complete default of its

contractual obligation to draft arbitration rules and to do so in good faith." Id. at 938. Here, First State and National Casualty negotiated the rules governing the instant arbitration, and National Casualty does not argue that the procedures in place are unfair. Thus, there has been no "wholesale relinquishment of the right to orderly and fair disposition of disputes." (Petition at 12.)

Similarly, in Hoteles Condado Beach, La Concha and Convention Ctr. v. Union de Tronquistas Local 901, 763 F.2d 34 (1st Cir. 1985), the First Circuit affirmed the district court's vacatur of an arbitration award where the arbitrator refused to give weight to the transcript of a criminal trial, which was the only record of testimony by a party's sole witness. This is not the case in the arbitration between National Casualty and First State, which has produced all relevant non-privileged documents to its adversary. The instant arbitration can under no circumstances be considered unfair or partial because there is no indication that the Panel would refuse to consider relevant evidence presented by National Casualty, and Hoteles Condado Beach is inapposite.[4]

Accordingly, First State's motion to dismiss the Petition should be granted.

---

[4]    Another case cited by National Casualty, New York Times Co. v. Newspaper and Mail Deliverers Union of New York and Vicinity, 740 F. Supp. 240 (S.D.N.Y. 1990), is also inapposite. That case involved contempt of an order by the district court in a labor dispute. First Preservation Capital, Inc. v. Smith Barney, Harris Upham & Co., 939 F. Supp. 1559 (S.D. Fla. 1996), also cited by National Casualty, actually supports First State's position that courts should defer to arbitrators on questions of arbitration of procedure:

> From the case law, it appears that arbitrators have considerably more discretion over rules and procedures than do federal courts. Plaintiffs here are requesting the Court to impose procedural dictates on the Panel, which Forsythe makes clear is inappropriate. This is a case in which the procedural questions affecting final disposition of the matter should be left to the Panel.

Id. at 1565 (citing John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S. Ct. 909 (1964); Forsythe Int'l S.A. v. Gibbs Oil Co. of Texas, 915 F.2d 1017 (5th Cir. 1990)).

## POINT II

### THE PETITION SHOULD BE DISMISSED BECAUSE THE ARBITRATION ORDER IS NOT A FINAL AWARD AND THEREFORE, MAY NOT BE REVIEWED BY THIS COURT

Section 10 of the Federal Arbitration Act sets forth the procedure for vacating arbitration awards. 9 U.S.C. § 10. Under this statute, only an arbitration award that is final may be vacated by a federal district court. Hart Surgical, Inc. v. UltraCision, Inc., 244 F.3d 231, 233 (1st Cir. 2001) ("In applying [9 U.S.C. § 10], we have followed the principle that '[i]t is essential for the district court's jurisdiction that the arbitrator's decision was final, not interlocutory.'") (quoting El Mundo Broad. Corp. v. United Steelworkers of Am., 116 F.3d 7, 9 (1st Cir. 1997)); Nationwide Mut. Ins. Co. v. First State Ins. Co., 213 F. Supp. 2d 10, 15 (D. Mass. 2002) ("Only a final [arbitration] decision – not an interlocutory one – is appealable . . . .").

"Normally, an arbitral award is deemed 'final' provided it evidences the arbitrators' intention to resolve all claims submitted in the demand for arbitration, even though the arbitrators purport to retain jurisdiction in the event the need arises to resolve some subsidiary matter, such as damages or backpay calculations." Fradella v. Petricca, 183 F.3d 17, 19 (1st Cir. 1999). An award that does not resolve all claims in arbitration may be deemed final for the purposes of 9 U.S.C. § 10 if it finally and definitely disposes of a separate, independent claim. Hart Surgical, Inc., 244 F.3d at 234 (citing Metallgesellschaft A.G. v. M/V Capitan Constante, 790 F.2d 280, 283 (2d Cir. 1986)).

Here, the Arbitration Order does not dispose of any claim submitted in the demand for arbitration. As discussed in Point I, supra, it merely addresses the procedural question of how to proceed in view of First State's withholding of the Privileged Documents. Thus, the Arbitration Order is not a final award and may not be challenged in this Court. The Petition should therefore be dismissed.

11

## POINT III

### EVEN IF THE ARBITRATION ORDER WERE A FINAL AWARD, AND IT IS NOT, THERE WOULD BE NO GROUNDS FOR ITS VACATUR UNDER THE FEDERAL ARBITRATION ACT

As demonstrated in Point II, supra, the Arbitration Order is not a final award. Even if it were final, however, there would be no grounds for its vacatur. Section 10 of the Federal Arbitration Act provides that an award may be vacated under the following circumstances:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any of other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

National Casualty claims that the "Panel's order compelling National Casualty to proceed with the arbitration while deprived of full and fair access to key evidence is fundamentally unfair and constitutes grounds for vacating the Panel's order[,]" pursuant to 9 U.S.C. § 10(a)(3). (Petition at 16.) In fact, the Arbitration Order is not fundamentally unfair because the Privilged Documents are irrelevant to the claims in arbitration, and the Panel's deferral of its ruling until the hearing does not constitute misconduct.

A.    The Privileged Documents Are Irrelevant

This case boils down to whether National Casualty is obligated to reimburse First State for the settlements it made on claims ceded to the Treaties. Thus, the dispute is one of contract interpretation: whether First State handled, settled and ceded the claims in accordance with the terms of the underlying policies and the Treaties. The only relevant documents, therefore, are

the underlying policies, the Treaties themselves and documents that show how First State actually handled, settled and ceded the claims. Opinions of First State's counsel about how they believed the claims should be handled, or whether they believed that the settlements were appropriate in light of then-current law, are simply not material in this contract dispute.

The cases cited by National Casualty, Travelers Cas. & Sur. Co. v. Gerling Global Reins. Corp. of Am., 285 F. Supp. 2d 200 (D. Conn. 2003), and Commercial Union Ins. Co. v. Swiss Reins. Am. Corp., No. Civ. A. 00-12267-DPW, 2003 WL 1786863 (D. Mass. Mar. 31, 2003), are inapposite. In Travelers, the reinsured contended that the only issue before the court was whether the "settlement of the number of occurrences issue with OCF and subsequent allocation of the payments under that settlement on a one-occurrence basis was reasonable under the circumstances." Travelers, 285 F. Supp. 2d at 208 (emphasis in original). Because the reinsured presented the issue in this manner, documents concerning the basis of settlement negotiations with the underlying insured were relevant. Id. at 209. In the dispute between First State and National Casualty, First State is arguing not only that its practice of handling, settling and ceding claims on a single occurrence basis was reasonable under the circumstances, but also that its practice was proper under the terms of both the underlying policies and the Treaties. Thus, documents that were relevant in Travelers are not relevant in the present matter.

In Commercial Union, the reinsured sought reimbursement from its reinsurer for a settlement with the insured, the dollar value of which was in excess of the limits expressly set forth in the reinsurance certificates. Commercial Union, 2003 WL 1786863 at *7. In ruling on cross motions for summary judgment, the court considered "the discussions among [the reinsured] and its attorneys over the question whether New York courts would interpret the [reinsured's] umbrella policies as providing annualized limits." Id. at *3. Although the case does not discuss how documents memorializing those discussions were produced, it is reasonable to infer from the facts that the reinsured voluntarily produced those documents to justify the structure of the settlement it reached with its insured.

In any event, in denying the reinsured's motion and granting the reinsurer's motion, the court held that "the clear language of the [reinsurance] Certificates does not permit the imposition of annualized limits on [the reinsurer] in excess of the stated per occurrence and aggregate limits." Id. at *10. Thus, the court ultimately concluded that the documents memorializing discussions between the reinsured and its attorneys were not relevant to the outcome of the case.

Moreover, in the present arbitration, the Panel is expressly "relieved of all judicial formalities and may abstain from following the strict rules of law." (Fourth, Second and Third Casualty Excess of Loss Treaties, annexed to the Petition respectively as Exhibits 1, 2 and 3, at Article XVI, ¶ 1.) Consequently, the Panel is not constrained to follow either Travelers or Commercial Union.

Because the Privileged Documents are not relevant to the dispute between First State and National Casualty, National Casualty would not be able to obtain a vacatur of a final award on the ground that it was denied full and fair access to "key" evidence.

B.    The Panel Did Not Engage in Misconduct

National Casualty further contends that it is entitled to a vacatur of the Arbitration Order because the Panel engaged in misconduct by refusing to "stay or adjourn the arbitration proceedings in the face of First State's conduct." (Petition at 18.) Like all of National Casualty's other arguments, this one also is groundless.

The Panel's decision not to postpone the arbitration hearing does not deprive National Casualty of a fundamentally fair arbitration because, as discussed above, the Privileged Documents are utterly irrelevant to the claims in arbitration. Moreover, despite the obvious non-materiality of the Privileged Documents, the Panel directed that they be produced by November 20, 2003. (November 15, 2003 Order, annexed as Exhibit 8 to Petition.) Having agreed to an arbitration clause that gives the Panel broad discretion to fashion appropriate remedies for the conduct of the parties during the arbitration, see Banco de Seguros del Estado, 344 F.3d at 261, National Casualty cannot now complain that the Panel has exercised that discretion by deferring

14

its decision concerning the consequences of First State's non-production until the hearing. Accordingly, there is no basis for a vacatur of the Arbitration Order.

## POINT IV

### THE PETITION SHOULD BE DISMISSED AS MOOT BECAUSE THE ARBITRATION HAS BEEN CONCLUDED

The arbitration between First State and National Casualty commenced on February 10, 2004, and has now been concluded. Thus, the Petition, which seeks, <u>inter alia</u>, to terminate the jurisdiction of the Panel and enjoin further arbitral proceedings, should be dismissed as moot. <u>Davidson v. Stanley</u>, No. Civ. 02-190-JD, 2003 WL 21785151, at *3 (D.N.H. Aug. 4, 2003) ("'[A] case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.' <u>Powell v. McCormack</u>, 395 U.S. 486, 496 (1969). Federal courts must dismiss moot cases to 'avoid advisory opinions on abstract propositions of law.'" <u>See</u> <u>Hall v. Beals</u>, 396 U.S. 45, 48 (1969)).

15

## CONCLUSION

For the foregoing reasons, First State's motion to dismiss the Petition should be granted in its entirety.

<div style="margin-left:50%">

First State Insurance Group
By its attorneys,

_Thomas Elcock_

Mitchell S. King, Esq. (BBO#2728107)
Thomas M. Elcock, Esq. (BBO #548027)
Prince, Lobel, Glovsky & Tye LLP
585 Commercial Street
Boston, Massachusetts 02109
(617) 456-8000

-and-

Lawrence S. Greengrass, Esq.
Lloyd A. Gura, Esq.
Todd A. Bakal, Esq.
Sanjit Shah, Esq.
Mound, Cotton, Wollan & Greengrass
One Battery Park Plaza
New York, NY 10004
(212) 804-4200

</div>

Dated: February 17, 2004

## CERTIFICATE OF SERVICE

I, Thomas M. Elcock, hereby certify that on February 17, 2004, I served First State Insurance Group's Memorandum Of Law In Support Of Its Motion to Dismiss National Casualty Company's Petition to Vacate Arbitral Order and Enjoin Further Arbitral Proceedings, Or, in the Alternative, Remand, by causing copies to be delivered via facsimile, hand delivery and first class mail, postage prepaid, to counsel of record for all parties.

_Thomas Elcock_

Thomas M. Elcock

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NATIONAL CASUALTY COMPANY, | ) | CIVIL ACTION NO:    04-10167MLW |
| Petitioner | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FIRST STATE INSURANCE GROUP, | ) | |
| Respondent | | |

## PETITION TO VACATE ARBITRAL ORDER AND ENJOIN FURTHER ARBITRAL PROCEEDINGS, OR, IN THE ALTERNATIVE, REMAND

### INTRODUCTION

This Petition arises out of an arbitration of a reinsurance dispute between First State Insurance Group ("First State") and National Casualty Company ("National Casualty").[1] Pursuant to 9 U.S.C. § 10, National Casualty requests that the Court vacate an order of an arbitration panel declining to postpone the hearing and either enjoin further arbitral proceedings or, in the alternative, remand to the arbitration panel for further proceedings consistent with the Court's Order. In summary, the grounds for the requested relief, which are spelled out in further detail in the Argument section of this Petition, are as follows:

1.     The arbitration panel is without jurisdiction to conduct any further arbitral proceedings as a result of National Casualty's right to terminate the arbitration agreement. National Casualty acquired this right as a result of First State's deliberate and willful refusal to comply with the arbitration panel's prior order requiring it to produce a large volume of highly relevant documents. The fact of this refusal is undisputed. As a matter of law, the refusal constitutes not only contempt of the arbitration panel but also a

---

[1]    Based on the Confidentiality Order issued by the arbitration panel, this Petition is being filed with a motion that it be filed and kept under seal.

gross material breach of the arbitration agreement. This breach excuses National Casualty from any further compliance with the arbitration agreement, effectively terminating it and thereby terminating the jurisdiction of the arbitration panel.

2.    In the alternative, even if the arbitration panel has not lost the basis for its jurisdiction, its order refusing to stay the arbitration and requiring National Casualty to participate in a hearing without having been provided by First State evidence that the panel had already ruled pertinent and material to the controversy is fundamentally unfair and prejudicial to National Casualty. The panel's order amounts to misconduct and warrants that this Court vacate the order and remand the matter to the arbitration panel for further proceedings consistent with the Court's order.

In support of this Petition, National Casualty states as follows:

## The Parties

1.    National Casualty is a corporation organized and existing under the laws of Michigan with a principal place of business in Wausau, Wisconsin.

2.    On information and belief, First State is a group of insurance companies organized and existing under the laws of the Commonwealth of Massachusetts, with their principal place of business at 150 Federal Street, Boston, Massachusetts, 02110.

## Jurisdiction and Venue

3.    Jurisdiction of this Court is proper pursuant to 9 U.S.C. § 10 and 28 U.S.C. § 1332, in that, save for the parties' arbitration agreements, this Court would have jurisdiction over the subject matter of a suit arising out of the controversy between the parties because there exists complete diversity of citizenship between them and the amount in controversy exceeds $75,000, exclusive of interest and costs.

4.    Venue is proper in this district pursuant to 28 U.S.C. §1391 in that First State resides within the district of Massachusetts.

## Factual and Procedural Background

5.    First State is the reinsured or cedent, and National Casualty is the reinsurer, under three reinsurance contracts (the "Treaties") providing First State with reinsurance coverage for losses it sustains as either a direct insurer or a reinsurer of its insureds' or cedents' underlying liabilities. Each Treaty provides for the arbitration of any dispute between First State and National Casualty "with reference to the interpretation of this Contract or the rights of either party with respect to any transaction under this Contract."[2]

6.    On May 9, 2002, First State made a demand for arbitration of two claims for reinsurance payments by National Casualty under the Treaties, arising from certain underlying losses First State had sustained as a result of settlements with its insureds or reinsureds. Thereafter, First State added a significant number of claims to the arbitration. By November 4, 2002, an arbitration panel was formed to resolve the dispute. An initial organizational meeting was held in early 2003. The final arbitration hearing is scheduled to begin February 10, 2004.

7.    Discovery commenced in early 2003. On July 14, 2003, after First State declined to produce numerous documents in the course of document discovery, the Panel ordered First State to identify all documents that it was withholding on grounds of relevance or privilege and to "itemize such documents and information and provide

---

[2]    Copies of the relevant sections of each Treaty are attached as National Casualty Exhibits 1-3.

enough detail to allow the Panel and National Casualty to verify the reasonableness of such non-production."[3]

8.    First State did not provide National Casualty with its privilege log until October 13, 2003, almost three months later.[4]  In that log, First State listed 757 documents that it maintained were privileged as attorney-client communications and work-product of counsel retained to advise and defend First State with respect to the underlying claims, *i.e.*, those it had agreed to settle and for which it was demanding reinsurance payments from National Casualty.

9.    National Casualty moved to compel production of all of the documents listed in First State's privilege log.[5]  Among other grounds, National Casualty argued that it is entitled to discovery of First State's communications with its counsel regarding the underlying claims based on the two companies' common interest as a reinsured and reinsurer, and that National Casualty has a contractual right of access under the Treaties to all of First State's books and records, including the 757 documents withheld by First State.

10.    First State opposed the motion to compel, arguing that an order requiring it to produce the 757 documents to its reinsurer would expose it to the charge of having waived the attorney–client privilege by third parties interested in the contents of these records.[6]

11.    On November 15, 2003, the arbitration panel rejected First State's arguments and ordered the production of the 757 documents to National Casualty by

---

[3]  A copy of the arbitration panel's order dated 7/14/2003 is attached as Exhibit 4.
[4]  A copy of the "privilege log" produced by First State is attached as Exhibit 5.
[5]  A copy of National Casualty's motion to compel of October 24, 2003 is attached as Exhibit 6.
[6]  A copy of First State's opposition to National Casualty's motion to compel is attached as Exhibit 7.

November 20, 2003.[7] The Panel ruled that the parties had a "common interest in the resolution of claims made under the treaties in dispute. . . . The Panel believes that such production will not waive any such privilege claimed against third parties." The Panel cautioned First State that "in the event the requested documents are not produced, the Panel will, by necessity, be required to draw whatever negative inference the Panel deems appropriate in the presentation of First State's position in this matter."

12.    First State willfully refused to comply with the Panel's order. In a letter submitted to the Panel on November 20, 2003, the date that its compliance with the order was due, and on the eve of the commencement of deposition discovery, First State informed the Panel that it found the risk of an adverse inference acceptable and would not produce any of the records.[8]

13.    First State's willful defiance of the Panel's order deprives National Casualty and the Panel of highly material and critical evidence concerning the claims at issue in the arbitration and undermines National Casualty's ability to mount a defense, all in flagrant breach of First State's good faith and fair dealing obligations under the arbitration agreement.

14.    In an effort to find a way to protect it rights, National Casualty immediately requested that the Panel stay the arbitration proceeding and permit the parties to fully brief the prejudicial impact of First State's conduct and appropriate and specific remedies, such as a stay of the proceeding until the order is obeyed or dismissal of the proceeding in its entirety.[9]

---

[7]    A copy of the arbitration panel's order of 11/15/2003 is attached as Exhibit 8.
[8]    A copy of First State's letter of 11/20/2003 is attached as Exhibit 9.
[9]    A copy of National Casualty's request for relief of 11/21/2003 is attached as Exhibit 10.

15.    On December 5, 2003, the Panel denied National Casualty's request for a stay and ordered depositions to begin and the hearing to go forward as originally scheduled on February 10, 2004, notwithstanding First State's refusal to comply with the Panel's order that it produce the 757 documents.[10] In its ruling, the Panel reiterated that "any inference that may be drawn from documents not produced will be made in favor of National Casualty" but that further briefing on specific sanctions was not necessary "at this time. The Panel has already reserved its right to decide that issue at the hearing scheduled as above when it has received evidence sufficient for it to determine what consequences are appropriate."

16.    By this order, the Panel has deprived National Casualty of an adequate opportunity to present, and itself of an opportunity to hear, evidence material to the claims at issue, while leaving First State's opportunity to introduce its evidence totally unimpaired.

17.    Because of the critical importance of the type of information that is contained in the withheld documents, coupled with the volume of withheld documents and the failure of First State's log to correlate any document with any claims, the potential application and curative effect of a generalized adverse inference are entirely uncertain and insufficient to protect National Casualty's right to receive, and the Panel's concomitant obligation to provide, a fair hearing.

## ARGUMENT

### A.    The Materiality of the Withheld Documents

The arbitration panel's prior order compelling First State to produce the withheld 757 documents properly reflected its understanding that the legal analysis that went into

---

[10]    A copy of the arbitration panel's order of 12/5/2003 is attached as Exhibit 11.

First State's decisions as to its loss settlements, and the basis for First State's presentation of the resulting reinsurance claims to National Casualty, is highly material to National Casualty's evaluation of First State's claims. National Casualty has the right to conduct such evaluation both in order to determine whether to pay or dispute a claim and, in a dispute that goes into arbitration, in order to prepare and assert its defenses.

As a leading reinsurance treatise has observed, the scope of a reinsurer's obligation to pay claims, often labeled as a duty to "follow the fortunes " or to "follow the settlements" of a cedent, is not absolute and does not "require a reinsurer to blindly follow the cedent's fortunes." Ostrager and Vyscocil, Modern Reinsurance Law and Practice (Glasses Legal Works 2000), § 9.03[a] at p. 9-15 (emphasis supplied). On the contrary, consistent with its own obligation to exercise due diligence, the reinsurer has the right to form a complete and independent understanding of the cedent's reinsurance claims through, among other things, comprehensive access to the cedent's documentation regarding its underlying loss settlements.

First State cannot be heard to dispute either the existence of this right or the reason for it, because it has insisted on exercising that very right when it itself is the reinsurer and has exhibited full understanding of its justification. For example, in a letter to one of its cedents, First State has demanded documentation, including exactly the same type of documents it has declined to produce to National Casualty, and correctly articulated exactly the same justification for the demand that it now refuses to accept from National Casualty and the arbitration panel:

> Inasmuch as the billings involved are significant, and the claims generating the billings are very complex, to begin to *fully understand* this billing and the claim resolution which has occasioned it I am obligated to request the opportunity to inspect

7

[the cedent's] <u>complete</u> claim **and counsel files** to fully evaluate our contractual obligations.[11]

Understanding the logic of a cedent's loss settlement, including the legal analysis that the cedent obtained and expects National Casualty to pay for, is indeed essential to a reinsurer's proper claim review and evaluation. In all cases, the reinsurer must ascertain whether the logic of the settlement is congruent with the terms of the cedent's own policies and the reinsurance contracts under which the claim is being presented. In cases where the cedent's presentation to the reinsurer entails questions regarding the number of occurrences, aggregation or allocation of loss settlement payments, the reinsurer must determine whether the presentation is congruent with the logic of the settlement and the terms of the reinsurance contract under which it is being asked to pay.

In this case, all three reinsurance contracts at issue include a clause that circumscribes National Casualty's "follow the settlements" obligation as follows:

> All loss settlements made by [First State], provided they are **<u>within the conditions of the Reinsured's original policies</u>** and within the terms of this Contract, shall be unconditionally binding upon National Casualty ... .[12]

Thus, because the consistency of First State's loss settlement with the terms of its own policies and the reinsurance contract is a condition of National Casualty's reinsurance payment obligations, the legal coverage analyses First State obtained before incurring the loss settlements form a body of evidence that is highly material to the determination of National Casualty's liability for First State's reinsurance claims arising from those settlements.

---

[11]    See First State correspondence of 3/7/00 submitted herewith as Exhibit 12. (Bold italics added; underlining in the original).

[12]    See Exhibits 1, 2, and 3 (emphasis added).

Access to First State's documentation bearing on the loss settlements being ceded is also essential to National Casualty's ability to ascertain whether First State's claim presentations are consistent with how the losses were actually settled, and to defend itself against any claim presented in a manner that, instead of mirroring the basis for the underlying settlement, is designed to maximize reinsurance recovery. *Travelers Cas. & Sur. Co. v. Gerling Global Reinsurance Corp. of America,* 295 F.Supp.2d 200 (D. Conn. 2003). *Gerling* provides an excellent example of the importance of contemporaneous documentation and other detailed evidence of how an underlying settlement was negotiated and achieved to a fact finder's ability to resolve a subsequent dispute over the cedent's presentation of its loss to its reinsurer. *Gerling* is particularly instructive to the case at bar because it involved an issue that is central to more than half of the claims and the bulk of the sums in dispute between the parties here. This issue is whether a cedent may legitimately use a single-occurrence presentation for a loss settlement arising out of the so-called asbestos non-products claims, i.e. claims made by thousands of individuals for bodily injury due to exposure to asbestos-containing materials on the premises, and/or in the course of operations, at hundreds of different locations, all across the United States, and over several decades.

The court in *Gerling* granted summary judgment upholding the reinsurer's rejection of the cedent's single-occurrence presentation on the ground that this presentation was at odds with "the actual settlement with OCF [the cedent's insured]," which "was not driven by a single occurrence theory." *Gerling,* 295 F.Supp.2d at 209-13. Key to the reinsurer's ability to support its contention, and the court's ability to reach its conclusion, was evidence of the factors that had driven the settlement negotiations,

9

including "an internal Travelers memorandum contemporaneous with the settlement

discussions with OCF that focuses extensively on the bottom line monetary analysis of

the settlement with no mention of the occurrence issue, see Pl.'s Ex. 11." *Id.* at 209.

Similarly, in *Commercial Union Ins. Co. v. Swiss Reinsurance America Corp.*,

2003 WL 1786863 (D. Mass. 2003), this Court found to be "[o]f particular relevance ...

the discussions among [the cedent] and its attorneys" and the attorneys' analyses of an

issue that arose, first, in connection with the cedent's dispute with its insured, and

subsequent to its settlement, in connection with the cedent's presentation to the

reinsurer.[13] *Id.* at *3. The evidence extensively discussed by the court included a number

of the cedent's outside lawyers' contemporaneous legal memoranda and correspondence

to the cedent. *Id.* at **3-5.

It is precisely the type of contemporaneous documentation that was made part of

the record and deemed highly probative in *Gerling* and *Commercial Union*[14] that

National Casualty requested of First State in the arbitration at issue, and then successfully

moved to compel First State to produce, only to be deprived of it by First State's

contumacious refusal to comply with the Panel's order.

**B.**    **First State's Refusal to Comply With the Arbitral Tribunal's Order to Produce the 757 Documents Operates to Terminate the Arbitration Agreement And the Arbitral Jurisdiction It Had Created**

It is submitted that First State's deliberate and willful contempt of the arbitration

panel's order is so gross a repudiation of the parties' arbitration agreement as to terminate

---

[13] The issue was whether its "policy limits would be annualized or would apply per policy, and whether these limits would be applied per site or per claim." *Commercial Union*, 2003 WL 1786863 at *3.

[14] It can reasonably be surmised that the internal memoranda, legal memoranda, and other evidence of attorneys' analyses and discussions with the client that were in the record in these cases had to have been produced in pre-trial discovery.

10

the agreement, and with it, the jurisdiction of the panel. Both a party's right to submit its

claims to arbitration, and the jurisdiction of an arbitral tribunal to decide them, require the

existence of a valid and enforceable arbitration agreement. *First Options of Chicago, Inc.*

*v. Kaplan*, 514 U.S. 938, 943 (1995). In the absence of a clear agreement of the parties to

arbitrate arbitrability, i.e., arbitral jurisdiction, the existence and enforceability of an

arbitration agreement is for the courts, to be decided under contract law. *Restoration*

*Preservation Masonry, Inc. v Grove Europe, Ltd.,* 325 F.3d 54, 60 (1st Cir.2003); MCI

*Telecommunications Corp. v. Exalon Industries, Inc.*, 138 F.3d 426, 429 (1st Cir. 1998).

*Id.* So is the question of whether such an agreement has ceased to exist. *Cf. Hooters of*

*America, Inc. v. Phillips,* 173 F. 3d 933, 940 (4th Cir. 1999)

It is a long and widely recognized fundamental principle of contract law that any

contract, even one that is valid and enforceable *ab initio,* can be forfeited by a party's

material breach.

> a "substantial breach going to the root of the contract"
> …would terminate [the other party's] obligation to fulfill
> the contractual promises it had made, for "[i]t is well
> established that a material breach by one party excuses the
> other party from further performance under the contract."
> … "A material failure of performance … operates as the
> nonoccurrence of a condition." …Nonoccurrence of a
> condition, in turn, postpones or terminates the promissor's
> obligation to perform."

*Prozinski v. Northeast Real Estate Services, LLC,* 59 Mass. App. Ct. 599, 610, 797

N.E.2d 415, 424 (2003) (citing Restatement (Second) of Contracts §§ 237, 225). *See*

*also, Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,* 217 F.3d 8, 11 (1st Cir. 2000) (also

citing Restatement (Second) of Contracts § 237 in support of the principle that "every

enforceable contract involves a bargained-for exchange of obligations, the material

11

breach of which by one party gives the other party a right to terminate."). *See generally,* 17A Am. Jur. 2d, Contracts § 621 (and cases from numerous jurisdictions collected therein).

In a court action, a finding that a plaintiff suing on a contract committed a material breach would entitle the defendant to a judgment dismissing the plaintiff's claim. *Prozinski*, 59 Mass. App. Ct. at 610. In the context of arbitration, since the proceeding itself constitutes performance of an arbitration agreement, a material breach of that agreement excuses the other party from further performance under the agreement and entitles it to the termination of the arbitral proceeding, or, if the breach is curable and the party wishes to cure it, to a stay of the proceeding until the completion of the cure.

First State's willful disregard of the arbitration panel's order compelling First State to produce the withheld documents constitutes a material breach of the arbitration agreement in several respects. An arbitration agreement is a mutual undertaking to forego the fundamental right of access to the courts. That undertaking, however, is not a wholesale relinquishment of the right to orderly and fair disposition of disputes. As a matter of arbitral and legal principles, the conduct of arbitration must assure "minimum due process standards," a "fair and impartial" resolution process, and respect for "the integrity of the arbitration process." *Hooters of America, Inc. v. Phillips*, 173 F. 3d 933, 939 (4th Cir. 1999) (summarizing expert testimony of leading arbitration experts and providers of arbitration services).

Fairness and respect for the integrity of the arbitration process are duties shared by all participants, including the parties. Indeed, for the latter, these duties are not solely ethical but legal; they are part and parcel of the duty of good faith and fair dealing that

the law implies in all contracts, including arbitration agreements. *Id.* at 940. Consistent with these time-honored ethical and common law values, the Federal Arbitration Act provides that a legally enforceable result can be yielded only by arbitration that is free from not only misconduct by arbitrators that deprives a party of "a fair hearing", *Hoteles Condado Beach, La Concha and Convention Center v. Union De Tronquistas Local 901*, 763 F.2d 34, 39-40 (1st Cir. 1985), but also of "corruption, fraud and undue means" on the part of the parties. 9 U.S.C.§ 10(a)(1).

An expectation of adherence to the ethical, common law and statutory rules of good faith and fairness in the conduct of arbitration is necessarily "an essential and inducing feature" of an arbitration agreement, *Prozinski*, 59 Mass. App. Ct. at 608, 797 N.E. 2d at 423. Plainly, no reasonable party would agree to give up the protections of the judicial system in favor of arbitration unless it was not only satisfied with the basic rules of the arbitration system but could count on the other party's willingness to abide by those rules. *Cf. The New York Times Co. v. Newspaper and Mail Deliveries' Union*, 740 F. Supp. 240, 245 (S.D.N.Y. 1990) ("disrespect for the arbitral process" and "resort to self-help rather than abide by the arbitration process" constitute unacceptable contemptuous conduct); *First Preservation Capital, Inc. v. Smith, Barney, Harris, Upham & Co.*, 939 F. Supp. 1559, 1565-1566 (S.D. Fla. 1996) (disregard for an arbitrator's discovery procedures constitutes "profound interference with and indifference to arbitration procedures" and is analogous to an egregious violation of the discovery process in court, punishable by the most severe Rule 37 sanction).

It is equally plain that, given the judge-like role of arbitrators in the arbitration system, abiding by its rules demands, among other things, that the parties obey

13

arbitrators' orders as long as they remain in effect. The system, and the laws that govern it, afford a party aggrieved by an order proper means to seek relief. However, a unilateral and deliberate decision to simply disregard the order is not among them and is as intolerable in arbitration as it would be in court. *First Preservation, id.; Givens v. Renteria,* 2003 WL 22951968 (Ill.App. 1 Dist 2003) ("duty to participate in the arbitration in good faith and a meaningful manner" includes duty to refrain from deliberate and contumacious "contempt of the arbitrators' authority.")

Therefore, First State's decision to withhold documents from National Casualty even after the arbitration panel ruled that National Casualty was entitled to them and ordered them to be produced was a flagrant and willful breach of its contractual obligation to conduct itself in this arbitration in good faith and fairly. Further compounding the gravity of this breach is the fact that its effect is to deprive National Casualty of evidence that, as demonstrated above, is essential to its preparation and presentation of its case at the arbitration hearing.

As First State must concede, having itself raised this issue elsewhere, the fairness of a hearing can be significantly impaired by restrictions on pre-hearing discovery. *Nationwide Mut. Ins. Co. v. First State Ins. Co.,* 213 F. Supp. 2d 10, 19 (D. Mass. 2002).[15] Deliberately disregarding an arbitral discovery order, with the intent and/or plainly foreseeable effect of depriving National Casualty of a fair hearing, is tantamount to seeking to procure an award "by fraud, or undue means," in violation of 9 U.S.C. § 10(a)(1). In the context of this provision of the FAA, "courts interpret the terms [fraud

---

[15]    There, First State's argument failed, but only because the court found it had been given ample opportunity to conduct discovery before the hearing and was only seeking to reopen it. The argument, however, is compelling here, because National Casualty is being forced to go into a hearing with its only discovery greatly curtailed by First State's stonewalling and contempt.

14

and undue means] together" to encompass "bad faith during the arbitration proceedings," including "willful destroying or withholding evidence." *In the Matter of the Arbitration Between Trans Chemical Ltd and China National Machinery Import and Export Corp.*, 978 F. Supp. 266, 304 (S.D. Tex. 1997).

In sum, in civil litigation, First State's deliberate refusal to comply with a discovery order would constitute a contempt of court and a violation of National Casualty's rights under the rules of civil procedure. In arbitration, it constitutes contempt of the arbitral tribunal and a violation of National Casualty's rights under the arbitration agreement. In a civil action, a plaintiff's material breach of contract would require dismissal of his contract claim. *Prozinski*, 59 Mass. App. Ct. at 610. Since the breach here is of an arbitration agreement, and is "so material," it justifies National Casualty "in throwing the contract over," and entitles it to recover damages for the breach with no set off for any contract damages claimed by First State. *Ward v. American Mutual Liability Insurance Co.*, 15 Mass. App. Ct. 98, 100-101, 443 N.E.2d 1342, 1343-1344 (1983).

Since arbitral jurisdiction exists only by virtue of an existing and enforceable arbitration agreement, "throwing over" the agreement here also ends the jurisdiction of the panel.[16] Therefore, National Casualty is entitled to end the arbitration at issue, with prejudice. In contrast to First State, however, National Casualty does not choose to act

---

[16] The Restatement of Contracts (Second) does recognize that under some circumstances, the effect of one party's nonperformance only postpones, rather than totally terminate, the other party's obligation to perform. *Id.*, § 237. That option, however, exists *only* for the purpose of allowing the breaching party to *cure* its breach. It is submitted that given the proximity of First State's breach to the arbitration hearing on the merits and its highly prejudicial effect on National Casualty's preparation, that option is no longer available to First State. Moreover, in the highly unlikely event that First State showed any interest in this option and offered to comply with the arbitration panel's order, National Casualty requests that the Court give it additional opportunity to address issues that crossing that bridge would entail, such as staying the arbitration until such time as National Casualty had had adequate opportunity to review and digest the newly produced documents, conduct additional deposition discovery, and revise its written submission and plan for the hearing.

unilaterally. Instead, while continuing to participate in the proceedings in accordance with the arbitration panel's still pending orders, National Casualty turns to this Court for relief affirming and effectuating its rights.

Accordingly, National Casualty requests that the Court, in the exercise of its power to decide matters of arbitral jurisdiction, *First Options*, supra, grant the following relief:

1.     Declare that, as a necessary consequence of First State's disregard of the arbitration panel's discovery order, (a) National Casualty is entitled to terminate the arbitration agreement, and that (b) the effect of that termination is to end the arbitration panel's jurisdiction;

2.     Vacate the order of the arbitration panel refusing to postpone the arbitration proceedings or to permit National Casualty to seek further relief;

3.     Issue an order enjoining First State and the arbitration panel from continuing to conduct any further arbitral proceedings; and

4.     Set this matter down for a hearing to assess National Casualty's damages.

**C.     Even If the Panel's Jurisdiction Remains Intact, Its Order To Proceed With Discovery and Hearing As Originally Scheduled, Notwithstanding First State's Contempt of Its Discovery Order, Constitutes Misconduct Requiring Vacatur**

The Panel's order compelling National Casualty to proceed with the arbitration while deprived of full and fair access to key evidence is fundamentally unfair and constitutes grounds for vacating the Panel's order. Section 10(a)(3) of the Federal

Arbitration Act, which applies here because the reinsurance transaction at issue is in interstate commerce, allows a federal court to vacate an arbitration award[17] if

> the arbitrators are guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or any other misbehavior by which the rights of any party have been prejudiced.

The "'touchstone' for a finding of arbitral misconduct under the Act is the concept of 'fundamental fairness.'" *Home Indemnity Co. v. Affiliated Food Distributors, Inc.*, 1997 WL 773712, *4 (S.D.N.Y. 1997) (allowing motion to vacate interim arbitration award that barred moving party "from defending itself by precluding discovery of files central and dispositive to the dispute before it.") While an arbitration panel has considerable leeway in the conduct of an arbitration proceeding, fundamental fairness requires that arbitrators "give each of the parties to the dispute an adequate opportunity to present its evidence and arguments." *Hoteles Condado Beach v. Union de Tronquistas* Local 901, 763 F.2d 34, 39 (1ˢᵗ Cir. 1985) (vacating arbitration award under § 10 (a)(3) where arbitrator deprived moving party of fair hearing by failing to give consideration to unquestionably relevant evidence). Accordingly, arbitrators must ensure that each party has full and fair access to material documents in the possession of the other prior to hearing and failure to do so is grounds for vacatur of a subsequent award.

> The absence of statutory provision for discovery techniques in arbitration proceedings obviously does not negate the affirmative duty of arbitrators to insure that relevant documentary evidence in the hands of one party is fully and timely made available to the other side before the hearing is closed. [A] failure to discharge this simple duty would

---

[17] For purposes of Section 10(a)(3), Courts treat an arbitrators' interim order as an "award" when it deals with " a discrete time-sensitive issue, ...even though other claims remain to be addressed." *Publicis Communication v. True North Communications, Inc.*, 206 F.3d 725, 729-730 (2000) (order requiring a party to arbitration to produce documents).

17

constitute a violation of [FAA 10(a)(3)], where a party can show prejudice as a result.

*Chevron Transport Corp. v. Astro Vencedor Compania Naviera, S.A.*, 300 F. Supp. 179, (S.D.N.Y. 1969) (holding that panel's failure to order timely production of certain key documents held by opposing party and refusal to adjourn proceedings would warrant vacatur of award with showing of prejudice, and denying motion to vacate without prejudice to moving party's right to present evidence of prejudicial impact of non-disclosure). *See also, Home Indemnity Co. v. Affiliated Food Distributors, Inc.*, 1997 WL 773712 (S.D.N.Y. 1997).

Here, it is clear that National Casualty's right to have an adequate opportunity to present its case and arguments to the Panel has been significantly prejudiced by First State's willful refusal to comply with the Panel's order that it produce the 757 documents, and by the Panel's refusal to stay or adjourn the arbitration proceedings in the face of First State's conduct. As set forth above, the 757 withheld documents are highly relevant to an evaluation of First State's loss settlements for the purpose of determining whether or to what extent any reinsurance liability for them should be imposed on National Casualty. The evidence contained in these documents is not cumulative of other evidence. Indeed, First State has assiduously removed from the arbitration proceeding any reference to the opinions and analysis of underlying claims or coverage counsel and would, instead, have the Panel rule on its claims as if the documents did not exist and the Panel had not ordered their production. In fact, First State's only hearing witness (and the deposition witness identified by First State as "the person most knowledgeable" of the multiple claims First State has put into arbitration) testified at deposition that he has never even looked at the privilege log listing the 757 documents and therefore had no

18

opinion "as to whether they are important or not to the underlying claim."[18] While First State insists that the 757 documents that it has not shown National Casualty or the arbitration panel are not "relevant" to the dispute, these pronouncements have no credibility in light of the fact that First State did not withhold the documents on relevancy grounds, these documents are so central to First State's view of liability that they would be devastating in the hands of its insureds, and the fact that the panel ordered that the documents be produced. Indeed, it would compound the prejudicial effect of First State's unilateral misconduct to place National Casualty "at the mercy of the adversary's judgment as to relevancy." *Home Indemnity Co. v. Affiliated Food Distributors, Inc.,* 1997 WL 773712, *4 (S.D.N.Y. 1997).

While the Panel has stated that "any inference that may be drawn from documents not produced will be made in favor or National Casualty," such prospective and potential "relief" is wholly illusory in the circumstances of this proceeding and does nothing to erase the severe prejudice to National Casualty in preparing and arguing its case. In all likelihood, the Panel expected that its "adverse inference" warning would be enough to induce compliance by First State with its order. However, as First State's conduct makes clear, the Panel's warning has been ineffective and has, instead, enabled First State to pursue its claims while unfairly forcing National Casualty to take depositions, prepare its hearing brief and conduct the hearing itself without the benefit of the 757 relevant documents that the Panel ordered to be produced.

---

[18]    *See* pages 131-135 of the Deposition of William Wigmanich, attached as Exhibit 13.

19

For all of the above reasons, National Casualty requests that the Court:

1.  Vacate the order of the arbitration panel refusing to postpone the arbitration proceedings or to permit National Casualty to seek further relief; and

2.  Remand the matter to the arbitration panel for further proceedings consistent with the reasons for the Court's vacatur.

## REQUEST FOR ORAL ARGUMENT

National Casualty believes that oral argument may assist this Court and respectfully requests an opportunity to be heard.

National Casualty Company,
By its Attorneys,

*Natasha C. Lisman* /AH

Natasha C. Lisman, BBO #301700
Susan A. Hartnett, BBO #544672
Sugarman, Rogers, Barshak & Cohen, P.C.
101 Merrimac Street, 9th Floor
Boston, MA 02114
(617) 227-3030


Mark C. Kareken, Esquire
400 Westwood Drive
P.O. Box 8101
Wausau, WI 54452-8101
(715) 843-8739


DATED:  January 26, 2004


#342553


20