UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSSETS

| | |
|---|---|
| NATIONAL CASUALTY COMPANY, | ) |
| | ) |
| Petitioner, | ) |
| | ) CIVIL ACTION NO: 04-10167MLW |
| v. | ) |
| | ) |
| FIRST STATE INSURANCE GROUP, | ) |
| | ) |
| Respondent. | ) |

### AFFIDAVIT OF MARK C. KAREKEN IN SUPPORT OF NATIONAL CASUALTY CASUALTY'S PETITION TO VACATE AN ARBITRATION AWARD UNDER §§ 9 U.S.C. 10(A)(1) AND (3)

Mark C. Kareken, first being duly sworn on oath, deposes and states as follows:

1. I make this Affidavit, in support of National Casualty Company's Petition to Vacate an Arbitration Award under 9 U.S.C. §§ 10(a)(1) and (3), based on my personal knowledge and could and would testify to its subject matter if that became necessary.

2. I was admitted to the practice of law before the courts of the State of Minnesota on October 21, 1986 and thereafter was admitted to practice law before the federal district court in Minnesota.

3. I am a member in good standing before the State Bar of Minnesota.

4. In September of 1988, I joined the national insurance and reinsurance coverage law firm of Zelle & Larson in Minneapolis, Minnesota.

5. One of Zelle & Larson's clients during my tenure with the firm was National Casualty Company ("National Casualty").

6. I left the Zelle & Larson law firm in August of 1996 and became Claims Counsel to Wausau Insurance Companies, at that time a member of the Nationwide Group of companies.

7. Effective January 1, 1999, Wausau ceased its affiliation with the Nationwide Group of companies and I became Claims Counsel to a subsidiary of Nationwide Mutual Insurance Company called Nationwide Indemnity Company.

8. Nationwide Indemnity Company has responsibility for managing the run-off of National Casualty discontinued operations, including assumed reinsurance.

9. My legal practice for the past 16 years has focused almost exclusively on general liability and reinsurance coverage issues, as well as arbitration.

10. I was assigned legal responsibility for the arbitration which gives rise to the present action when First State Insurance Group ("First State") demanded arbitration with National Casualty Company on May 9, 2002.

11. I maintained sole legal responsibility for the arbitration until it became necessary to retain counsel admitted before this Court in December of 2003, just prior to National Casualty Company's filing of its original petition in this matter.

12. The basis for this litigation arises out of First State's refusal to comply with an Order of the Arbitration Panel ("Panel") directing First State to produce 757 items First State had withheld from production to National Casualty.

13. National Casualty maintains that: (a) First State's refusal to comply with the Panel's Order constituted a material breach of the parties' agreement to arbitrate that ended the Panel's jurisdiction to decide the parties' dispute, (b) First State's refusal to comply with the Panel's Order was a part of First State's effort to procure a favorable

award by "undue means," and (c) First State's refusal to comply with the Panel's Order deprived National Casualty of a fair hearing.

14. To appreciate the bases for National Casualty's contention that the award was procured by "undue means" and that National Casualty was deprived of fair hearing requires a bit of background .

15. General liability insurance protects the insured against the damages it causes to third parties and property arising out of specified risks.

16. For example, the typical policy protects the insured against the bodily injury it causes to third persons by the insured's products. Such coverage is usually written to apply on an aggregate basis, meaning that regardless of how many persons are injured and/or products are involved, the insurer's liability is capped at a single sum.

17. Such policies also provide the insured with protection against bodily injury caused to third parties while the insured is conducting its operations. For example, someone exposed to asbestos while working at a location where the insured was installing asbestos containing products would be an operations risks. Operations coverage is most commonly written on a per occurrence basis, meaning that the limit of the insured's liability is determined by the number of occurrences.

18. Insurance companies writing general liability coverage typically spread their financial exposure through the use of reinsurance.

19. Reinsurance is a contract of indemnity under which the reinsurer agrees, subject to the terms and conditions of the contract, to reimburse the insurer/reinsured/ceding company, for all or a portion of the loss the insurer/reinsured/ceding company sustains.

20.  In addition to the terms the reinsurance contract, reinsurance is governed by a number of industry principles. Relevant here is the principle known as "follow-the-settlements". The "settlements" principle precludes the reinsurer from "second-guessing" the insurer/reinsured's compromise of a dispute with the insured, so long as the settlement was in good faith and neither fraudulent nor collusive. The three-part corollary to the "settlements" principle is that the insurer/reinsured (1) must fully disclose to the reinsurer the basis on which it settled, (2) cannot shape the settlement with its insured and its billing to the reinsurer in a manner designed to maximize reinsurance recovery, and (3) cannot impose liability on the reinsurer where none otherwise existed under the reinsurance contract.

21.  First State issued various contracts of insurance and reinsurance that were potentially reinsured by National Casualty.

22.  At the time of the Final Hearing in the underlying arbitration, there were ten First State claims against National Casualty in dispute, arising out of underlying settlements of claims against the following insureds: Armstrong Contracting & Supply, A.H. Robins, Asarco, Eli Lilly, Owens-Corning Fiberglass ("OCF"), Pfizer, Pulmosan, Safety Kleen, Shook & Fletcher and W.R. Grace & Co. Of the $572,038 in dispute, $394,922 was related solely to the OCF claim.

23.  For illustrative purposes, I have selected the OCF claim to discuss in this Affidavit, i.e. the First State reinsurance claim against National Casualty arising out of First State's settlement of a coverage dispute with OCF. The context of the claim that engendered that dispute is as follows.

24. When the toxic-tort of asbestos bodily injury first appeared back in the late 1970's and early 1980's, the plaintiffs were focused primarily on insureds that manufactured asbestos containing products. These types of claims implicated the products liability coverage of the manufacturers. To reiterate, such coverage is typically written subject to an aggregate limit, i.e., a single sum.

25. By the mid-1990's, after almost every manufacturer was bankrupted by the asbestos product liability claims, the plaintiffs' bar turned its attention to those insureds who had been installers or servicers of asbestos-containing products, making what came to be called "asbestos non-product claims". These types of claims implicated the insureds' operations coverage. As previously noted, such coverage is written subject only to an occurrence limit, i.e., the number of occurrences determines the insurer's limit of liability.

26. OCF involved First State's settlement of asbestos non-product claims against OCF.

27. Central to First State's obligations relative to the OCF asbestos non-product claims was the number of occurrences, i.e., one occurrence would minimize First State's exposure, whereas, multiple occurrences would multiply First State's exposure. At the same time, however, one occurrence, just like aggregation, would maximize both the chance that First State would reach the threshold required for reinsurance coverage and the amount of potential reinsurance recovery, whereas multiple occurrences would make the chance of First State's even reaching the reinsurance threshold virtually nil.

28. Ultimately, First State resolved OCF's asbestos non-products claims through a settlement. As presented to National Casualty, the settlement agreement did not address or answer the question of the number of occurrences.

29. However, as a basis for its billing of National Casualty for the OCF loss, First State presented it to National Casualty as involving a single occurrence.

30. National Casualty maintained that all asbestos non-product losses could not be a single occurrence and that First State selected this approach solely for the purposes of making a reinsurance recovery.

31. The Panel issued a discovery order on July 14, 2003. Therein, the Panel addressed the question of whether First State was required to prepare a log of all documents withheld from production. The Panel directed First State "to itemize such documents and information and provide enough detail to allow the Panel and National Casualty to verify the reasonableness of any such non-production." Amended Petition ("Am. Pet.") Exhibit 4.

32. Despite having been ordered to produce a privilege log of all withheld items on July 14, 2003, First State's did not serve its privilege log on National Casualty until thirteen weeks later, on October 13, 2003.

33. National Casualty pressed for the production of 757 documents listed on the log as privileged. First State opposed National Casualty's request on the grounds that they were not only privileged but also irrelevant. Am. Pet. Ex. 7.

34. The Panel issued its ruling on the issue November 15, 2003, rejecting First State's privilege and relevance objections and ordering the production of "any

document requested by Respondent National Casualty that relate to the handling of the underlying claims and related litigation at issue in this arbitration." Am. Pet. Ex. 8.

35. First State refused to comply with the Panel's order for production. Am. Pet. Ex. 9.

36. In my many years of practice, in the course of which I have been involved in numerous arbitrations, discussed arbitration experiences with many other members of the reinsurance and arbitration bar, and have attended and spoken at numerous professional seminars dealing with issues and developments in the arbitration law and practice, I had never before encountered or heard of a party responding in such manner to an arbitration panel's order – without seeking reconsideration or judicial review, just unilaterally declining to comply with the order.

37. My response was to request that the Panel make a determination of the consequences for First State's actions before the normal course of the arbitration can resume. I stressed to the Panel, that it would be virtually impossible for National Casualty to meet its burden of proof without the withheld information. I drew the Panel's attention to F.R.C.P. Rule 37(b)(2) and the options available to a court for punishing non-compliance with a discovery order. I also reminded the Panel of First State's contractual duty of full disclosure and that said material breach of contract vitiated any entitlement to recovery that First State otherwise might have had. Likewise, I pointed out the Panel's obligation to ensure a fair hearing and that depriving National Casualty of the withheld information would be extremely prejudicial. Lastly, I requested that the Panel stay the arbitration until proper briefing and resolution of the issue could be had. Am. Pet. Ex. 10.

38.    However, the panel declined to adjust the arbitration schedule in any way to allow the parties an opportunity to fully develop their positions on the consequences of First State's decision to withhold the documents in spite of the Panel's order. Consequently, I had to conduct deposition discovery and mount National casualty's defense at the Final Hearing without the benefit of the withheld documents, and the Panel, likewise, went on to consider the case on the merits without these documents in the record.

39.    Based on my training and experience in the arbitration of reinsurance disputes, it is my understanding and opinion that the type of documentation of the underlying claim that National Casualty sought and First State denied in this case is essential to the ability of a reinsurer to define, develop and prove the defenses that contractual provisions and the law make available to reinsurers. To return to asbestos non-product claims such as the OCF claim as an illustrative example, a reinsured's claim documentation -- or, in the words of the Panel order that First State chose to disregard, "documents ... that relate to the handling of the underlying claims and related litigation" -- may well include statements that directly or by fair inference show that the reinsured and/or its lawyers believed that non-product claims are not a single occurrence. Such documents constitute material and weighty evidence for the reinsurer's case and the arbitrator's decision on the issue of whether the insured presented its loss to the reinsurer as a single occurrence in order to make a recovery. *Travelers Cas. & Sur. Co. v. Gerling Global Reinsurance Corp. of America*, 285 F.Supp.2d 200 (D. Conn. 2003), is an actual case that demonstrates the use and usefulness of claims handling evidence provided by the reinsured. Because reinsurers have no involvement in the handling of the

underlying claims, the reinsured is the only source from which a reinsurer can obtain such potentially valuable evidence.

Signed under the penalties of perjury this __13th__ day of January, 2005.

_____
Mark C. Kareken

#358359