UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
-----------------------------------------------------X
NATIONAL CASUALTY COMPANY,

        Plaintiff,

v.

FIRST STATE INSURANCE GROUP,

        Defendant.
-----------------------------------------------------X

CIVIL ACTION No. 04-10167-MLW

## DECLARATION OF LLOYD A. GURA

I, Lloyd A. Gura, declare:

1.     I am a member of the law firm of Mound Cotton Wollan & Greengrass, attorneys for Defendant First State Insurance Group ("First State"), and the principal attorney representing First State in the arbitration with National Casualty Company ("National Casualty"). As such, I am fully familiar with the facts and circumstances of this action. I respectfully submit this declaration in opposition to Plaintiff National Casualty's Supplemental Memorandum in Support of its Petition to Vacate Arbitration Award Under §§ 9 U.S.C. 10(a)(1) and 10(a)(3) and the January 13, 2005 Affidavit of Mark C. Kareken (the "Kareken Affidavit").

2.     National Casualty seeks the <u>vacatur</u> of the March 12, 2004 final award (the "Award") rendered in the arbitration proceeding because First State allegedly violated an interim panel order directing it to produce certain First State documents not subject to disclosure by reason of the attorney-client privilege and the attorney work-product doctrine (the "Privileged Documents"). According to National Casualty, First State's withholding of the 757 Privileged Documents resulted in prejudice to National Casualty, despite First State's production of thousands of pages of documents from its files. Annexed hereto as Exhibit 1 is a true and correct

copy of a September 23, 2003 letter from Mark C. Kareken to Todd A. Bakal, acknowledging on behalf of National Casualty the receipt of "some 11,000 pages of material." National Casualty selected these documents from more than 100,000 pages of material that it reviewed while auditing First State's files during pre-hearing discovery. (First State's Brief in Opposition to National Casualty's Request for Privileged Documents, Amended Petition Ex. 7, at 18.)

3. Notably, at the hearing, it became clear that during prior, non-arbitration audits of First State, National Casualty had reviewed most, if not all, of the Privileged Documents. Annexed hereto as Exhibit 2 is a true and correct copy of relevant excerpts of the transcript of the arbitration hearing conducted from February 10, 2004 to February 12, 2004 (the "Hearing Tr."). Specifically, Hannah Huryk, Manager for Assumed Reinsurance at Nationwide Indemnity Company and one of the National Casualty claims handlers, testified that during a previous audit of First State, she reviewed the Privileged Documents, which she described as a "table full of material." (Hearing Tr., at 1039:3-1039:22)

4. Among the Privileged Documents reviewed by Ms. Huryk were memoranda prepared by the law firm of Hogan & Hartson, counsel to First State in connection with the underlying claims, for which First State is seeking reinsurance from National Casualty. (Hearing Tr., at 1089:6-1089:24, 1091:1-1091:24.) Ms. Huryk's notes of these memoranda indisputably support First State's position that it had settled the Owens Corning Fiberglass claim discussed in the Kareken Affidavit, as a single occurrence. (Hearing Tr., at 1089:14-1090:11.)

5. Ms. Huryk's notes also demonstrate that First State settled other claims on a single occurrence basis, and not on a multiple occurrence basis as argued by National Casualty. (E.g., Hearing Tr., at 1056:12-1056:21, 1093:24-1094:16.)

6. After considering the evidence presented by the parties and hearing the arguments of counsel, the panel rendered the Award, which was in favor of First State. The negative inference that the panel drew from First State's withholding of the Privileged Documents resulted in a denial of costs to First State. In this proceeding, National Casualty has not articulated how the Privileged Documents, which it previously reviewed, would have helped it to prevail at the hearing. Having seen the Privileged Documents earlier and been given the opportunity to take notes on their contents, it was incumbent on National Casualty to point out to the panel and this Court any documents that support its position. This was not done because no such documents exist. The Court should not substitute its judgment for that of the panel regarding the proper application of the negative inference given the inherent weakness in National Casualty's case.

I declare under penalty of perjury that the foregoing is true and correct. Executed on January 27, 2005.

_____
Lloyd A. Gura

# EXHIBIT 1

MARK C. KAREKEN, ESQ.
Senior Claims Counsel
Direct Dial: 715/843-8739
Facsimile: 715/843-8798
E-mail: karekem@nationwide.com



**national casualty**
company

September 23, 2003

<u>**VIA FACSIMILE AND REGULAR MAIL**</u>

Todd A. Bakal, Esq.
MOUND, COTTON, WOLLAN & GREENGRASS
One Battery Park Plaza
New York, NY 10004-1486

Re: In the Matter of the Arbitration between First State and National Casualty Company

Dear Mr. Bakal:

I have September 22, 2003 letter that you electronically transmitted yesterday afternoon. We cannot agree with your suggestion that depositions can be completed by October 3, 2003 or that the final hearing can take place as originally scheduled.

We acknowledge receipt of some 11,000 pages of material from your office last week. As you are aware, however, First State has still not produced the log of documents it has withheld from production. It is our understanding that First State has withheld materials from both the items National Casualty requested be copied – as a result of its on-site reviews - and those maintained in ECLIPS. First State has yet to advise National Casualty when First State will make its log of withheld materials available to National Casualty. Even after the log is produced to National Casualty, it must be reviewed and any disagreements submitted to the Panel for resolution. Without the log, we have no idea how involved a process that will be or how long it will take to resolve. Moreover, taking depositions before document discovery is completed creates the distinct possibility that such depositions will be incomplete. It makes no sense to pursue a course of action that contains an obvious and inherent flaw, i.e., that deponents will have to be recalled to answer questions about previously withheld materials.

As you are aware, the Panel instructed First State on July 14th to produce the ECLIPS materials as quickly as possible. Having suggested to the Panel that nothing substantive existed in ECLIPS, it took First State nine and a half weeks First State has produced almost 11,000 pages of materials. Putting aside peoples' schedules and other commitments, it is unreasonable to expect that National Casualty can digest this volume of material and complete depositions on both sides by October 3rd. This conclusion does not even consider the problem presented by the absence of First State's log of withheld materials and the time to resolve any issues it creates.

NATIONAL CASUALTY COMPANY
ICO NATIONWIDE INDEMNITY COMPANY • REINSURANCE MANAGEMENT SERVICES
400 WESTWOOD DR • WAUSAU WI • (715) 843-8600 • FAX (715) 843-8769
MAILING ADDRESS: PO BOX 8067 • WAUSAU WI 54402-8067

Todd A. Bakal, Esq.
First State v. National Casualty Arbitration
September 23, 2003
Page 2

As you'll recall (see your 8/7/03 letter to me), National Casualty's person most knowledgeable deposition notice required at least ten days advance notice of the deposition. Counting today, there is only one day, October 3rd, which meets the ten-day requirement contained in both parties' deposition notices. We see no reason to abandon a requirement that was included in the notices specifically for the purpose of providing adequate time for preparation.

First State has now designated William Wigmanich as the person most knowledgeable to speak for First State with respect to all topics identified in National Casualty's deposition notice. National Casualty, however, also requested the depositions of every individual First State intends to call as a hearing witness. Are we to conclude that Mr. Wigmanich is both the person most knowledgeable and the only individual First State intends to call to testify at the final hearing? Your October 3rd cut-off proposal also fails to consider that National Casualty may wish to depose persons that the produced documents reveal as having had significant involvement relative to the issues in dispute.

First State's September 12th deposition notices request the depositions of two former Nationwide employees, Messrs. Bare and Cahill. As I mentioned in my September 17th letter to Mr. Cass, we must first obtain these individuals' consent to appear for depositions – presumably in Columbus – and if not, then First State will have to decide whether it wishes to request subpoenas from the Panel to compel Messrs. Bare and Cahill to appear and then attempt to serve and enforce the subpoenas. All of this will take considerably more time that you have allowed for in your proposed schedule.

Lastly, your proposed schedule fails to consider the schedules and commitments of National Casualty's likely witnesses and counsel. I am not in a position to drop everything else to complete depositions by October 3rd or briefing by October 31st. The original schedule provided no less than two months from the completion of discovery to the submission of reply briefs. It is unfair and unrealistic of First State to produce 11,000 pages last week, leave completely unaddressed and unresolved the withheld document issues, and expect a deposition process – originally allotted two months for completion be completed in less than two weeks - and a briefing process - originally allotted two months for completion – to be concluded in one month.

We encourage First State to reconsider its scheduling proposal and agree with National Casualty that a November hearing may have appeared possible in January, but is no longer a viable option. We request that First State join National Casualty's request for the Panel to provide dates after November 2003 when they are available to conduct the final hearing. Assuming First State rejects National Casualty's suggestions, we request that the Panel act by granting National Casualty's September 22, 2003 request that the final hearing in this matter be moved to a mutually acceptable date after November 2003.

Todd A. Bakal, Esq.
First State v. National Casualty Arbitration
September 23, 2003
Page 3

Very truly yours,

*[signature: Mark C. Kareken]*

Mark C. Kareken
First State v National Casualty OCF Arbitration 9/22/03 letter to Bakal.doc

Cc:  R. Michael Cass (via fax)
     Dennis Gentry (via fax)
     Paul N. Steinlage (via fax)
     Susan E. Grondine, Esq. (via fax)

# EXHIBIT 2

```
                                                      694
 1  *****************************************
 2  IN THE MATTER OF THE ARBITRATION BETWEEN
 3  FIRST STATE INSURANCE GROUP,
 4                      Petitioner
 5      and
 6  NATIONAL CASUALTY COMPANY,
 7                      Respondent
 8  *****************************************
 9                  VOLUME: III
10                  PAGES:  694-1140
11
12  BEFORE PANEL MEMBERS:
13          R. Michael Cass, Chairman
14          Paul N. Steinlage
15          Dennis C. Gentry
16
17  Date:     Thursday, February 12, 2004
18  Held at:  Wyndham Hotel
19            89 Broad Street
20            Boston, Massachusetts
21  Commence: 8:30 a.m.
22
23  Reporter: Judith McGovern Williams,
24            CSR, RPR, CRR
            G & M COURT REPORTERS & ASSOCIATES
              (617) 338-0030   (800) 655-3663
```

```
                                                      696
 1  APPEARANCES (Continued):
 2
 3  For the Respondent:
 4  MARK C. KAREKEN, ESQ.
 5  Claims Counsel
 6  Nationwide Indemnity
 7  400 Westwood Drive
 8  P.O. Box 8101
 9  Wausau, Wisconsin  54402-8101
10  karekem@nationwide.com
11  715-843-8739
12
13  ALSO PRESENT (during some or all of Day 3
14  hearing):
15
16  Michael Al-Hussainy
17  William Wigmanich
18  Frank Lagana
19  Daniel K. Myhrer
20  Hannah R. Huryk
21  Frederick C. Schaefer
22  David Robb
23
24
            G & M COURT REPORTERS & ASSOCIATES
              (617) 338-0030   (800) 655-3663
```

```
                                                      695
 1  APPEARANCES:
 2
 3  For the Petitioner:
 4  MOUND, COTTON, WOLLAN & GREENGRASS
 5  Lloyd A. Gura, Esq.
 6  Todd A. Bakal, Esq. and
 7  Kristen Hackford, Legal Assistant
 8  One Battery Park Plaza
 9  New York, New York  10004
10  lgura@moundcotton.com
11  tbakal@moundcotton.com
12  212-804-4200
13      and
14  SUSAN E. GRONDINE, ESQ.
15  Horizon Management Group, LLC
16  150 Federal Street
17  Boston, Massachusetts  02110
18  sgrondine@horizonmgt.com
19  617-526-7720
20
21
22
23
24
            G & M COURT REPORTERS & ASSOCIATES
              (617) 338-0030   (800) 655-3663
```

```
                                                      697
 1                   I N D E X
 2  Witness                                    Page
 3  Frederick C. Schaefer
 4    Redirect Examination by Mr. Kareken      699
 5    Recross Examination by Ms. Gura          703
 6
 7  Daniel Kevin Myhrer
 8    Direct Examintion by Mr. Kareken         717
 9    Cross Examination by Mr. Gura            755
10    Further Recoss by Mr. Gura               963
11
12  Hannah Huryk
13    Direct Examination by Mr. Kareken        966
14    Cross Examination by Mr. Gura           1037
15
16
17
18                E X H I B I T S
19  Number                                     Page
20    FS
21    103   One-page Pulmosan Outstanding      889
22          Issues for Carrier Meeting
23          February 10/11/2000, production
24          number FS 01578
            G & M COURT REPORTERS & ASSOCIATES
              (617) 338-0030   (800) 655-3663
```

1038

1  A. Sure.
2  Q. -- at First State/Hartford. You have
3     audited both at Boston and Hartford?
4     Correct?
5  A. Yes.
6  Q. And the first time you audited, was that
7     in 2001? You can look at our chart. I am
8     not trying to trick you. It is right
9     there.
10          (Handing FS Exhibit No. 99 to
11    the witness.)
12 Q. I think from your testimony you said 2001?
13 A. That says the first time. I thought I had
14    been there earlier than that. I thought I
15    had been there in 2000, but.
16 Q. That is fine. It doesn't matter, 2000,
17    2001.
18 A. I audited with the team often and fairly
19    regularly since my employment with the
20    company.
21 Q. And you have heard Mr. Wigmanich explain
22    and describe First State's procedures
23    concerning audits and the access to and
24    production of privileged documents; isn't

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

1040

1     the Fred Schaefer/Bill Wigmanich report?
2  A. You mean the letter?
3  Q. Yes. The letter.
4  A. Yes.
5  Q. What is the date of that letter?
6  A. The date of the letter is April 2001.
7  Q. And this letter, that you know is an
8     exhibit here, it is First State 101, the
9     letter from Jackie Rackle to Fred
10    Schaefer --
11 A. That's correct.
12          (Handing FS Exhibit No. 101 to
13    the witness.)
14 Q. -- you have seen that?
15 A. Yes.
16 Q. This is now a letter written in response
17    to that 2001 audit in November -- October
18    and November, and she says quite clearly,
19    "As you are aware, it is our policy to
20    remove all privileged and confidential
21    documents" from the materials we sent to
22    you; correct?
23 A. That's correct. That's what that says.
24 Q. Did you ever write a letter to First State

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

1039

1     that right?
2  A. Yes.
3  Q. And I think he described it as initially
4     access was given and privileged documents
5     were not produced in writing or that
6     photocopies were not made and produced to
7     reinsurers? Do you recall that?
8  A. I do recall that he said that.
9  Q. Okay. In 2001, is it your testimony that
10    you expected to receive copies of
11    privileged documents?
12 A. Yes. That was my expectation.
13 Q. That is the October-November audit?
14    Correct?
15 A. Yes.
16 Q. Obviously, you would have looked at those
17    privileged documents during that audit?
18    That is why you had that expectation?
19    Correct?
20 A. I did look at them. Yes.
21 Q. Okay.
22 A. I had a table full of material. Yes.
23 Q. And there was some discussion, and you saw
24    us all fighting, and you are familiar with

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

1041

1     expressing your shock and amazement at the
2     change in the policy that they are no
3     longer giving you copies of the privileged
4     and confidential documents?
5  A. I believe that in my denial letter on
6     Owens Corning I do express my shock and
7     amazement at having 500 pages of documents
8     withheld.
9  Q. That's in --
10 A. In relation to the single claim?
11 Q. Right.
12 A. Yes.
13 Q. Let's go to that. That was your January
14    -- no, no, no. I am sorry. That was your
15    January 9, 2002 letter?
16 A. That is the January 9th. It was signed by
17    Mr. Cohen, and I testified that --
18 Q. Yes. That you basically drafted it?
19 A. Yes.
20 Q. And you are from Wausau, and he signed his
21    name?
22 A. Yes.
23    CHAIRMAN CASS: What?
24    ARBITRATOR STEINLAGE: What

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

1054

1  Q. And turn to item number 6 of the
2     agreement.
3        (Witness complying.)
4  Q. It says, "By entering into this agreement,
5     neither Wausau nor OCF have made, nor
6     shall they be deemed to have made, any
7     admission of any kind concerning insurance
8     coverage or any other matter. No payment
9     made under this agreement is, nor shall it
10    be deemed to be, any admission or evidence
11    of the existence of any coverage, the
12    amount of any coverage, or the
13    non-existence of any coverage under any of
14    the policies. No payment made under this
15    agreement is, nor shall it be deemed to
16    be, any admission or evidence of the
17    position of any party as to any matter,
18    including, without limiting the generality
19    of the foregoing, the issues of what
20    constitutes bodily injury, property damage
21    or an occurrence under any of the policies
22    or any other insurance policy."
23       Do you see that?
24 A. Yes.

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

1055

1  Q. Is that typical language in a settlement
2     agreement for a case like this?
3  A. Well, I don't know if it is typical in a
4     case like this, particularly in light of
5     it being a product liability claim. For
6     the most part, I think it seems obvious
7     that there was only $240,000 paid for
8     nonproducts claims. If this was strictly
9     a product liability claim, I'm not sure
10    that there would be language like this in
11    it at all.
12 Q. You are guessing right now? You have no
13    idea?
14 A. Yes.
15 Q. I don't want you to guess. That is why I
16    ask you, please --
17 A. I don't handle direct side claims on
18    behalf of Wausau, Wausau International
19    underwriters, which is this.
20 Q. All I am asking is with respect to
21    settlement agreements, you have seen that
22    language is standard? No agreement to
23    anything? You are just settling? That is
24    pretty standard language between, in a

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

1056

1     settlement between an insured and an
2     insurer?
3  A. I don't think it is typical for every
4     settlement, not a simple aggregate
5     payment. But in issues where things are
6     disputed, I think it is not atypical.
7  Q. Okay. Now do you know if Wausau was
8     excess of 25 million, just like in the
9     First State layer?
10 A. I have no direct knowledge of Wausau's
11    coverage at all.
12 Q. Okay. We will get to that. It's in your
13    notes.
14       Ms. Huryk, are you disputing
15    that Aetna took the position with First
16    State -- excuse me -- with NERCO that
17    they, that Aetna, was ceding it to NERCO
18    as a single separate occurrence?
19 A. No. I think that it was ceded to NERCO as
20    a single separate occurrence.
21 Q. All right.
22 A. I think NERCO disputed that --
23 Q. I don't --
24 A. -- and asked for information related to

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

1057

1     that.
2  Q. Okay. And with respect to the IIC cession
3     to NERCO, are you disputing that that was
4     ceded to NERCO -- I'm not asking how NERCO
5     handled it. I understand that is a
6     subject we will get into.
7  A. A subject of the dispute.
8  Q. Right. I want to know IIC's position was
9     it was ceding the claim to NERCO as a
10    single separate occurrence?
11 A. Yes.
12 Q. Okay.
13 A. They were ceding it on that basis.
14 Q. I am trying to see if we can agree to some
15    broad things --
16 A. Okay.
17 Q. -- so I can cross out the swath of my
18    cross examination.
19 A. Okay.
20 Q. If we could turn to Exhibit No. 97.
21       (Witness complying.)
22 Q. If you can turn to 4676. Do you see the
23    number on the top right corner?
24 A. Yes.

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

1086

1  Is that what you are saying?
2       MR. GURA: Actually, I can show
3  that every document withheld is matched up
4  in her notes.
5       MR. KAREKEN: I am sorry. The
6  argument being made here is they don't
7  have the right to deprive us of making the
8  case with the documents they withheld.
9  They now want to say they shouldn't be
10 penalized from withholding the documents
11 from you and us because we saw them
12 supposedly once upon a time. This has
13 nothing to do with the merits of why we
14 didn't pay, which is why Hannah Huryk is
15 testifying.
16      MR. GURA: Then why does she
17 testify about that, that she didn't get
18 documents --
19      MR. KAREKEN: If you want to
20 argue about --
21      CHAIRMAN CASS: Okay.
22      ARBITRATOR GENTRY: Let's go off
23 the record for a minute.
24      CHAIRMAN CASS: Sure.

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

---

1  occurrence, 20 percent multiple occurrence
2  limits; single occurrence 80 percent, one
3  additional limit." Do you see that?
4  A. Yes.
5  Q. Going a little further, if you look at
6     page 00957.
7         (Witness complying.)
8  Q. There is a document that actually may
9     start on the page before dated 12-11-00.
10 A. Yes.
11 Q. It says settlement values provided to the
12    ADR person?
13 A. Yes.
14 Q. And this is by different valuations by the
15    claim handler, by Hartford in-house
16    counsel, by Pat Hofer at Hogan & Hartson,
17    and Bill Bowman at Hogan & Hartson. Do
18    you see that at the top of 957?
19 A. I think that is what I wrote.
20 Q. That is all I am asking. And then under
21    A, it says "1 same occurrence," and it
22    gives some percentages. Do you see that?
23    "35, 30, 40, 30"?
24 A. It does.

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

---

1087

1       (Discussion off the record.)
2       (Recess taken at 5:45 p.m.)
3       (Recess ended at 6:02 p.m.)
4  BY MR. GURA:
5  Q. Ms. Huryk, we are on page 955.
6  A. Yes.
7  Q. There in your typed notes from your audit,
8     1/21/2000. Do you see that?
9  A. Yes.
10 Q. Further down, it says "Decision tree
11    analysis." Do you see that?
12 A. Yes.
13 Q. And it says "Predate analysis policy
14    subject to one occurrence (under
15    Wellington), W 90 percent, L 10 percent."
16    Do you see that?
17 A. Yes.
18 Q. Going further down it says "OL" -- I think
19    you meant OC -- "will not argue"?
20 A. Yes. That must -- probably is supposed to
    be OC.
   Q. "OC will not argue multiple occurrence or
23    else they don't reach the excess
24    coverage." Further down, "multiple

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

---

1  Q. And then further down, it says, "Postdate,
2     A, separate single, no," and then it gives
3     some other percentages, "70, 60, 50 and
4     55"? Do you see that?
5  A. I do see that.
6  Q. If you turn to 958, 4/26/01 is a Hogan &
7     Hartson exhaustion analysis. Do you see
8     that?
9  A. I do.
10 Q. "Which policies attach and/or consumed and
11    when analysis is based on," four different
12    things. Do you see that?
13 A. I do.
14 Q. Those are your notes of that document?
15    Correct?
16 A. Those are notes of the document. Yes.
17 Q. And the next document, you are taking
18    notes on, is a 4-26-01 Hogan & Hartson
19    memo on number of occurrences. Do you see
20    that?
21 A. I do.
22 Q. It says, "At no time no one ever argued
23    multiple occurrence." Do you see that?
24 A. I do.

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

**Page 1090**

1    MR. KAREKEN: It says "no one
2    ever."
3    MR. GURA: I think that is what
4    I said.
5    MR. KAREKEN: You said no time.
6    THE WITNESS: "No one ever
7    argued." It is there.
8    MR. KAREKEN: I am sorry. I
9    must be looking in the wrong spot.
10   MR. GURA: On the line before it
11   says, "At no time no one ever."
12   MR. KAREKEN: Okay.
13   BY MR. GURA:
14   Q. It says, "If First State were right and
15      all asbestos claims arose out of the same
16      occurrence, then they'd owe zero; if First
17      State argued multiple occurrence, OC got
18      no coverage." Do you see that?
19   A. Yes.
20   Q. The next line, "If OC were right, single
21      separate occurrence, then all limits are
22      exposed plus defense in addition to
23      limits." Do you see that?
24   A. I do.

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

**Page 10**

1    Q. That's your name?
2    A. Yes.
3    Q. Can you tell me where this document came
4       from?
5    A. Yes. This is a document that was produced
6       to us in an Odyssey arbitration.
7    Q. Who was the arbitration between? Odyssey
8       and who?
9    A. Wausau and --
10   Q. Odyssey and Wausau?
11   A. Yes.
12   Q. You were testifying on behalf of Wausau in
13      that arbitration?
14   A. Yes.
15   Q. Was that arbitration subject to a
16      confidentiality order do you know?
17   A. Yes. It was.
18   Q. Okay. So the document which was produced
19      in that arbitration which was subject to a
20      confidentiality order and which was never
21      produced to us in this case which for the
22      first time appeared in your brief, is that
23      a violation of the confidentiality order
24      in that case?

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

**Page 1091**

1    Q. Next line, another undated Hogan & Hartson
2       memo analyzing, "Analysis of the extent to
3       which OC would prevail in demonstrating
4       nonproducts ID." Do you see that?
5    A. Yes.
6    Q. That Hogan & Hartson memo before that,
7       4/26/01, is that the one that was included
8       in your brief at Exhibit 142 do you know?
9    A. I don't know.
10   Q. Do you have Exhibit 142? I think you have
11      Exhibit 142 there in that binder in front
12      of you. It is the Wigmanich binder that I
13      think it is in.
14      (Witness complying.)
15   Q. Do you see that document, ma'am?
16   A. I do.
17   Q. Also a memo from file from Mr. Bowman at
18      Hogan & Hartson on number of occurrences.
19      Do you see that?
20   A. I do.
21   Q. Same date; same date. Is there an exhibit
22      stamp on the bottom of that document? Do
23      you see that?
24   A. Yes.

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

**Page 10**

1    A. Well, this document was probably produced
2       to us in the course of an audit as well,
3       but it was also produced to us as part of
4       that arbitration.
5    Q. Are you guessing now?
6    A. I don't -- you know, I don't know.
7    Q. You don't know. Okay. That's fine.
8       Okay. We are done with that exhibit.
9       (Handing documents to Panel,
10      witness, and counsel.)
11      MR. GURA: This is First State
12      107.
13      (Handwritten notes, production
14      number 00823 through 00835
15      marked FS Exhibit No. 107.)
16   BY MR. GURA:
17   Q. First State 107, Ms. Huryk, is some more
18      notes of yours. Is that right?
19   A. Yes.
20   Q. And I think Mr. Kareken showed you certain
21      points in our brief where we quoted your
22      notes. Do you recall that?
23   A. Yes.
24   Q. Okay. If you look under here on the first

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

**1094**

1   page, I think it is the first one, it
2   says, "Aetna states that, as a matter of
3   law, the courts have determined that the
4   manufacture, sale and delivery of asbestos
5   constitutes a single occurrence." Do you
6   see that?
7   A. That's correct.
8   Q. You are familiar with certain courts
9      holding that way? Is that correct?
10  A. Certain courts hold that way. Other
11     courts hold other ways.
12  Q. Exactly my point. Thank you.
13        And this, all of these notes,
14     concern documents that you looked at
15     during audits; correct?
16  A. Yes.
17  Q. Okay.
18  A. And, you know, I would like to say a
19     little something about notes. One, these
20     aren't verbatim of the documents that I
21     have seen. There might be --
22  Q. You can do that on redirect. I didn't ask
23     you anything. I think the Panel can
24     determine, they have seen some of these

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

**1095**

1   documents, whether they are verbatim or
2   not. These are your notes of the
3   documents. That is all I am trying to
4   establish, ma'am.
5        CHAIRMAN CASS: He gets to ask
6   the questions.
7        THE WITNESS: That is fair
8   enough.
9   Q. If you could turn to Exhibit 65.
10       (Witness complying.)
11  Q. Ms. Huryk, to some extent I have
12     handwritten notes, but Exhibit 65 is some
13     of your typewritten notes out of those
14     handwritten notes; is that right?
15       ARBITRATOR GENTRY: This is
16  National Casualty or First State?
17       MR. GURA: First State 65.
18       MR. KAREKEN: I don't know if
19  she has that.
20       THE WITNESS: Yes. This goes
21  from 45 to 67.
22       CHAIRMAN CASS: It is not in the
23  Wigmanich?
24       MR. GURA: No, it is not in the

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

**10[96]**

1   Wigmanich.
2        MR. KAREKEN: It is not going to
3   be in that. It is not going to be in
4   that. No. That stays up here. It should
5   be in there.
6        (Handing FS Exhibit No. 65 to
7   the witness.)
8   A. I have it.
9   Q. Okay. And that's -- you testified on your
10     direct about you had discussions with
11     Mr. Dowd concerning the North River-Owens
12     Corning settlement? Do you recall that?
13  A. I do.
14  Q. And the first paragraph says, "After
15     reviewing the material provided, I asked
16     if I could discuss the loss with an
17     individual who handled the evaluation and
18     settlement negotiations. NERCO produced
19     Tom Dowd, VP. He was the individual who
20     was primarily responsible for managing the
21     claim." Do you see that?
22  A. I do.
23  Q. If you turn to the next page, it says
24     after the first full paragraph, "After

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

**10[97]**

1   reviewing the file, I asked for the
2   opportunity to speak with the claims
3   adjuster to determine how the claim was
4   finally resolved, and I asked for the
5   arbitration file."
6        Do you see that?
7   A. Yes.
8   Q. "We had the following questions," and you
9      had five questions. Do you see that?
10  A. Yes.
11  Q. Not one of those questions concerns the
12     number of occurrences, single, separate or
13     multiple? Correct?
14  A. That's correct.
15  Q. Okay. If you go down to the second to
16     last paragraph, I think it is the third
17     sentence in, it says, "Ultimately, NERCO"
18     -- and this is your notes of your
19     discussions with Mr. Dowd; correct?
20  A. Yes.
21  Q. Okay?
22  A. Where are you?
23  Q. "Ultimately."
24  A. Where are you?

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

1138

1  MR. KAREKEN: I guess it depends
2  on your perspective of what exciting is.
3  MR. GURA: I have no idea what
4  they say. You expressed an interest.
5  ARBITRATOR GENTRY: I expressed
6  an interest they be given to the Panel.
7  MR. GURA: Then we will make
8  photocopies and provide them to the Panel.
9  CHAIRMAN CASS: Are you finished
10  with your cross?
11  MR. GURA: Yes.
12  CHAIRMAN CASS: Do you know now
13  whether you plan to do any redirect?
14  MR. KAREKEN: I do know now I
15  will be doing no redirect.
16  CHAIRMAN CASS: Except for Panel
17  questions, Ms. Huryk, you are finished.
18  So we will start at nine tomorrow morning
19  with Panel questions --
20  MR. KAREKEN: Okay.
21  CHAIRMAN CASS: -- for
22  Ms. Huryk.
23  MR. GURA: Can we start at 9:30?
24  THE WITNESS: 9:30?

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

1139

1  CHAIRMAN CASS: Then we will
2  move into the closing argument.
3  MR. GURA: Can we start at 9:30?
4  THE WITNESS: I thought you were
5  going to start earlier.
6  CHAIRMAN CASS: If you promise
7  you won't go more than an hour.
8  MR. GURA: Then we will start at
9  nine. I specifically think we will, I
10  will go more than an hour, so nine o'clock
11  is fine.
12  CHAIRMAN CASS: So the hearing
13  is continued until nine tomorrow morning.
14  (Handing documents to the Panel
15  and counsel.)
16  MR. GURA: Why don't we just
17  mark this on the record as First State
18  109.
19  (Group of Reinsurance Reports,
20      first report dated
21      September 16, 1998 marked
22      FS Exhibit No. 109.)
23  (Whereupon, at 7:04 p.m., the
24  arbitration was adjourned.)

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663

1140

1  CERTIFICATE
2
3  I, Judith McGovern Williams, do
4  hereby certify that the foregoing record
5  is a true and accurate transcription of my
6  stenographic notes taken in the
7  within-entitled cause on February 12,
8  2004, to the best of my knowledge, skill
9  and ability.
10
11
12  _____
13  Judith McGovern Williams
      Registered Professional Reporter
14
15
16
17
18
19
20
21
22
23
24

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030    (800) 655-3663