UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| NATIONAL CASUALTY COMPANY,<br>Petitioner | )<br>)<br>) |
| v. | ) CIVIL ACTION NO: 04-10167MLW<br>)<br>) |
| FIRST STATE INSURANCE GROUP,<br>Respondent | )<br>)<br>) |

### REPLY TO RESPONDENT'S OPPOSITION
### TO PETITIONER'S SUPPLEMENTAL MEMORANDUM
### CONCERNING VACATUR UNDER §§ 9 U.S.C. 10(A)(1) AND (3)

National Casualty submits this memorandum to address a new argument asserted by First State in its Memorandum in Opposition to Plaintiff National Casualty's Supplemental Submission ("FS Opposition"). In the several prior rounds of briefings in this matter, First State argued that its refusal to comply with an order to produce 757 documents in the underlying arbitration had caused National Casualty no prejudice because the documents were not only privileged but irrelevant.[1] Apparently concerned about this contention's effectiveness, First State now supplements it with a second contention: that the withheld documents support its positions on the merits and thus would not have been helpful to National Casualty.[2]

As National Casualty previously demonstrated, the first contention is indeed fatally flawed.[3] To reiterate briefly, the contention is precluded because the arbitration

---

[1] See Defendant First State Insurance Group's Memorandum of Law in Support of Its Motion to Dismiss National Casualty Company's Amended Petition to Vacate an Arbitral Award and For Other Relief pp. 13-15, and Defendant First State Insurance Group's Reply Memorandum of Law in Further Support of its Motion to Dismiss National Casualty Company's Amended Petition to Vacate an Arbitral Award and for Other Relief, pp. 4-5.

[2] FS Opposition, pp. 2, 9-10.

[3] See Petitioner's Opposition to Respondent's Motion to Dismiss Amended Petition, pp. 5, 7-8.

panel had rejected it in an order not open for judicial review,[4] and, in any event, constitutes an impermissible characterization of a body of evidence that is not before this Court and is available only to First State. As will be shown below, First State's new contention provides no effective fall-back, because it is likewise an impermissible characterization and is predicated on a distorted and irrelevant circumstance.

> I. **Without The Withheld Documents In The Record, First State's Assertion That They Would Not Have Been Helpful To National Casualty Is A Repeat Of Impermissible "Take My Word For It" Advocacy**

By asserting that the 757 withheld documents support First State's and not National Casualty's positions in the arbitration, First State brazenly persists in asking this Court to accept yet another affirmative characterization of the documents sight unseen. This "take my word for it" brand of advocacy shows fundamental disregard for the proper role of the court and the rights of opponents in an adversarial process. It is this Court's authority and obligation to read and interpret the documents for itself before making any determination about them, be it relevance to or impact on the two sides' claims and defenses. While in performing this task, the Court can be assisted by counsel's argument, surely each side's attorneys are entitled to an equal opportunity to study the documents, formulate their analyses, and be heard by the Court. That First State tries to have it both ways in this proceeding, i.e. withhold the documents from the record and yet unilaterally characterize their content and significance, just as it did in the arbitration, shows that unfair play is its modus operandi and that, having subverted the fairness of the arbitration, it is now bent on subverting the fairness of the judicial review of it as well. It is precisely

---

[4] Indeed, since the panel conclusively ruled the documents were not privileged from National Casualty, it is highly improper for First State to persist in labeling them "Privileged Documents."

because First State got away with this maneuver in the arbitration that the arbitral award cannot be permitted to stand.

>   II.   **First State's Representation That It Had Produced "Certain Privileged Documents" For National Casualty's Pre-Arbitration Review Is A Distortion, An Irrelevant Diversion And Serves Only To Expose First State's Claim Of Privilege As A Bad Faith Pretext For Shielding The Withheld Documents From Independent Scrutiny By National Casualty's Counsel, The Arbitration Panel, And Now This Court.**

After steadfastly asserting unshakable concern about waiver of privilege as its justification for withholding the 757 documents, even in the face of an arbitral order that they were not privileged as to National Casualty and must be produced, First State informs the Court that prior to the arbitration, it had found a way to allow National Casualty access to "*certain* Privileged Documents *on a non-waiver basis*, and … *these* documents supported First State's position that its settlements with its underlying insureds had been on a single occurrence basis."[5] This representation is a distortion and an irrelevant diversion.

>   A.   **National Casualty Had No Meaningful Opportunity To Review The "Certain" Privileged Documents Because Of First State's Peculiar "Look But No Copy" Notion Of Protecting The Privilege**

What the testimony at the hearing showed[6] - viewed as a whole rather than the few lines plucked by First State out of context - was that on two occasions, National Casualty auditors were permitted to conduct an audit of First State's claims. The audits consisted of document inspection and interviews of First State claims personnel, at First State offices in Boston and Hartford, in space of a few days. The auditors were presented

---

[5] FS Opposition, p. 2, 9-10 (emphasis supplied).

[6] See excerpts from the testimony of Hannah Huryk and Frederick Schaefer submitted herewith as Exhibits A and B, respectively.

with voluminous documentation "for large coverage actions being handled by the underlying cedents with rooms full of documents [such as] DJ files that go on for 10 years and then are finally settled…. It is room full of documents with things going on and on."[7] Given the limited time, the auditors "looked at the files" but not in the sense of "reviewing and having an opportunity to obtain information and analyze information."[8] While one of them took notes on a few documents, it was certainly impossible "to scribe them all."[9]

Therefore, the audit was not an opportunity to review the documents in any meaningful sense. All the auditors could accomplish was rapidly run through the documents, tag those of potential interest and fill out First State's standard document copy request forms.[10] That First State had such forms shows that it was fully aware of the reality of such audits.

Based on an agreement between the parties, the auditors went to First State expecting that First State would copy all requested documents, including those it deemed privileged as to third parties, and ship them to National Casualty, where the auditors would finally have the opportunity for a careful study and analysis of the documents.[11] However, after National Casualty tagged and requested copies of documents it wanted, First State refused to provide copies <u>of any tagged document</u> it had declared privileged.[12]

---

[7]    Exh. A, pp. 569-572.

[8]    Exh. B, pp. 975, 1065.

[9]    Exh. A, p. 572; Exh. B, p. 981.

[10]   Exh. A, p. 575, Exh. B, p. 975, 1028, 1063-1065.

[11]   Exh. A, pp. 573-576, 585-586; Exh. B, pp. 983, 985-986

[12]   Exh. B, p. 1039.

Without comparing the two sets of documents, it is not possible to tell whether the documents that First State withheld after the audits on the basis of its peculiar "look but no copy" privilege position are the same as the 757 it withheld in the arbitration.[13] But even if all or some were, it is clear that in any meaningful sense of the word "review," none of the documents First State refused to copy had ever been made available to National Casualty for a review.

Nonetheless, based on this "look but no copy" policy, First State proceeded to sandbag National Casualty at the arbitration hearing, as it now is trying to sandbag it in this Court, by arguing that withholding the 757 documents from National Casualty's counsel and the arbitrators could not have harmed National Casualty. In effect, First State argues that since some of these documents had been shown to National Casualty, National Casualty's auditors must have committed them to memory or taken verbatim notes, fully understood their legal significance and, had any of the documents been helpful to National Casualty's case, it would have proven their content at the hearing through the auditors' recitation and/or notes, all without any need for its counsel or the arbitrators to see the documents themselves.

This argument is patently absurd and nothing but a gigantic distraction. When documents exist and are available for an evidentiary hearing, no party should have to substitute hearsay recollection of witnesses or their hearsay notes about them for the documents themselves, nor can any fair and rational fact finder allow witnesses and notes to speak for the documents, which if allowed, best speak for themselves. In addition, a review of documents for purposes of an ordinary claim audit is not the same as litigation

---

[13]   Exh. A, p. 586; Exh. B, p. 1014.

or arbitration counsel's review and analysis of documents in discovery and strategic use to shape and present his client's case.

> B. **First State's Reliance On Its Prior Disclosure Of Some Allegedly Privileged Documents Demonstrates The Pretextual Nature Of Its Justification For Withholding the 757 Documents In Violation Of The Panel's Order**

If First State's new contention shows anything, it is that its justification for depriving National Casualty, its counsel, and the arbitrators of the opportunity to review and consider the withheld documents is so utterly hollow that it cannot be deemed anything other than a pretext. If the Privileged Documents were truly privileged, why was it possible to provide "certain" of them, *voluntarily,* on a "non-waiver basis" for inspection before the arbitration, but not possible to provide copies of all of them on the same "non-waiver" basis in the arbitration, where the "non-waiver" would only have been reinforced by the fact that arbitration was conducted under a confidentiality agreement covering all documents and the production of the privileged documents would have been under the compulsion of the panel's order rather voluntary? And if First State had been genuinely concerned that even production under such circumstances could be deemed a waiver of the privilege as to some future hypothetical third party, how could this risk be removed by allowing witnesses who had seen the documents disclose their content orally or through notes?

The obvious answer is that the withheld documents were clothed with no cognizable privilege, either because they were not privileged as to National Casualty to begin with, as the panel ruled, or the privilege had been waived well before the arbitration. That waiver, furthermore, operated not only as to the documents shown to

National Casualty in the audits, but all other documents related to the same subject because the privilege, when applicable, cannot be invoked selectively.

In sum, with its new argument, First State has made it crystal clear that its excuse for disobeying the panel's order is utterly incredible and served no purpose other than to limit the record to documents helpful to its case – self serving reports to re-insurers and final lump-sum settlement agreements studiously silent as to the basis on which it settled its insureds' claims. In contrast to First State's claimed interest in maintaining a non-existent privilege by ineffectual means, National Casualty had a genuine and valid interest in access to the documents to which the panel ruled it was entitled, i.e. all documents that "*relate* to the handling of the underlying claims and related litigation *at issue* in this arbitration."[14]

It is important to understand the reason for this interest. Applying the "follow the settlements" doctrine in a wooden manner, First State insists that all that National Casualty needed to know about a settlement for which First State presented a reinsurance billing was that it had made the settlement and how much it paid. However, the billings were based on allocations of the sums paid, whether by different policies, or policy periods, or the number of occurrences. As a leading practitioner and writer in the field of reinsurance has explained, when it comes to allocations, it is not enough for the cedent to show that it settled with its insured for a certain sum:

> Proper allocations … require rational consideration of many circumstances, such as liabilities, contract layers, periods, limits and coverages, **number and relationships of loss occurrences**, as well as reasonableness and good faith in the conduct of underlying litigation and negotiation. … In allocating loss settlements it will be in the obvious interest of the cedent to group losses in [such ways] where they will most penetrate reinsurance. When the cedent has

---

[14]    Exhibit 8 to National Casualty's Amended Petition.

>made a lump-sum settlement … ***reinsurers are bound to scrutinize the allocation closely.*** … A reasonable test proposed by experienced writers and speakers in the field is "that [the following settlements clause] should apply only if the allocation decision was necessarily and genuinely part of the claims settlement process." [15]

In ordering First State to produce all documents that "*relate* to the handling of the underlying claims and related litigation *at issue* in this arbitration," the panel recognized National Casualty's legitimate interest, and indeed its own also, in being able to determine whether First State's allocation decisions had been "necessarily and genuinely part of the claims settlement process," or, rather, driven by First State's interest in reinsurance. To illustrate the point, the document summarized in National Casualty's auditor's notes that First State now cites as an example to show that a particular "matter was settled by First State on a single occurrence basis,"[16] far from clearly suggests that conclusion. In fact, the comment in the notes that "at no time no one ever argued multiple occurrence,"[17] could plausibly be construed as supporting the inference that First State's insured was motivated to maximize its lump sum recovery and, to facilitate First State's willingness to pay a higher number, was perfectly willing to join in refraining from articulating a position on the number of occurrences that would preclude or minimize First State's reinsurance recovery.

Ultimately, only the document itself, not the notes, and all other First State internal analyses read together, can show which side of the issue the withheld documents support. Having manipulated the record to keep out such analyses, it is utter *chutzpah*

---

[15] Staring, *Following Settlements and Following Allocations*, Mealey's Litigation Report: Reinsurance, v. 15, Issue # 15, December 2, 2004. (Emphasis added)

[16] FS Opposition, pp. 9-10.

[17] FS Opposition, p. 10.

for First State to now proclaim that "that there is nothing in the record that would permit a finding that the Privileged Documents contain information that is helpful to National Casualty."[18]  First State should either be estopped from denying that the withheld documents would have yielded evidence supporting National Casualty's positions or at least compelled to produce the documents now for an informed and fair determination of the issue by the Court, with input from both sides.

                      NATIONAL CASUALTY COMPANY,
                      By its Attorneys,

                      _/s/ Natasha C. Lisman_____
                      Natasha C. Lisman, BBO #301700
                      Susan A. Hartnett, BBO #544672
                      Sugarman, Rogers, Barshak & Cohen, P.C.
                      101 Merrimac Street, 9th Floor
                      Boston, MA  02114
                      (617) 227-3030

Dated:  February 11, 2005

#359356

---

[18]  FS Opposition, p. 10.