Page 336

```
 1   ******************************************

 2   IN THE MATTER OF THE ARBITRATION BETWEEN

 3   FIRST STATE INSURANCE GROUP,

 4                    Petitioner

 5   and

 6   NATIONAL CASUALTY COMPANY,

 7                    Respondent

 8   ******************************************

 9                    VOLUME:   II

10                    PAGES:    336-693

11

12   BEFORE PANEL MEMBERS:

13            R. Michael Cass, Chairman

14            Paul N. Steinlage

15            Dennis C. Gentry

16

17   Date:       Wednesday, February 11, 2004

18   Held at:    Wyndham Hotel

19               89 Broad Street

20               Boston, Massachusetts

21   Commence:   9:00 a.m.

22

23   Reporter:   Judith McGovern Williams,

24               CSR, RPR, CRR
```

Page 549

1  we are having a dialogue on that issue --
2       MR. GURA: I just wanted to make
3  sure I understood.
4       ARBITRATOR GENTRY: -- wouldn't
5  the determination that a given policy
6  relates to a loss automatically attach a
7  treaty or make it subject to a treaty,
8  whether or not it is covered under that
9  treaty with all the exclusions and other
10 terms and conditions? But once the policy
11 pays out something, under these contracts
12 as I understand them, you're going to have
13 coverage under the contract unless it is
14 otherwise excluded by some means, so, you
15 know, it is not casualty, for some reason?
16      MR. GURA: Right. Or it is one
17 of the enumerated exclusions.
18      ARBITRATOR GENTRY: Yes.
19      (Witness excused.)
20      CHAIRMAN CASS: Okay? Mr. Gura,
21 your case -- you have closed your direct
22 case?
23      MR. GURA: We reserve our right
24 on rebuttal, but other than that, yes.

Page 550

1       CHAIRMAN CASS: We will take
2  until 2:30, and they will start National
3  Casualty's direct presentation.
4       (Recess taken at 2:23 p.m.)
5       (Recess ended at 2:35 p.m.)
6       (Witness sworn.)
7       FREDERICK C. SCHAEFER
8       DIRECT EXAMINATION
9  BY MR. KAREKEN:
10 Q. Good afternoon, Mr. Schaefer.
11 A. Good afternoon.
12 Q. Could you state your full name for the
13    record, please?
14 A. Frederick C. Schaefer, S-C-H-A-E-F-E-R.
15 Q. Do you mind if I call you Fred?
16 A. Go ahead.
17      THE WITNESS: And you, too,
18 Mr. Gura.
19      MR. GURA: Thank you.
20 Q. Could you tell us what your present
21    position is with Nationwide Indemnity
22    Company?
23 A. Yes. I am the director of reinsurance
24    claim and legal.

Page 551

1  Q. And can you give the Panel an idea of the
2     types of responsibilities that you have in
3     that position?
4  A. I am generally responsible for the assumed
5     reinsurance book of business assigned to
6     Nationwide Indemnity on a domestic basis,
7     all the domestic business, coming from
8     Wausau, National Casualty, Nationwide,
9     Farmland, and Underwriters.
10 Q. So kind of like First State, Nationwide
11    Indemnity handles run-off business for
12    discontinued operations of either
13    Nationwide Mutual Insurance or any of a
14    number of its affiliates?
15 A. That's correct. It is generally treaty
16    casualty business that is running off.
17    Although there may have been property, it
18    is all pretty much run-off.
19 Q. And correct me if I am wrong, Fred, but I
20    think you have been doing that pretty much
21    since you joined the organization?
22 A. Yes. In varying roles since I joined in
23    1996.
24 Q. That is pretty much all you have done? In

Page 552

1     other words, you have only handled
2     reinsurance matters on behalf of any of
3     those companies since you joined the
4     Nationwide group of companies, so to
5     speak?
6  A. That is correct. Only assumed
7     reinsurance.
8  Q. And you have a law degree; correct?
9  A. Correct.
10 Q. And a license to practice law in
11    Wisconsin?
12 A. Wisconsin and Illinois.
13 Q. Illinois. Okay. In fact there was a
14    period of time when you actually practiced
15    law at various law firms?
16 A. Yes. When I was in Chicago, I practiced
17    for two firms, Brenner & Moltzen and
18    Purcell & Wardrope.
19 Q. Correct me if I am wrong, Fred, but I
20    think you were doing, at least at one of
21    those firms, insurance-related type
22    matters?
23 A. Yes. At Brenner & Moltzen I was doing
24    coverage work for various insurance

Page 565

1  Q. I am showing you First State Exhibit 99.
2     (Handing FS Exhibit No. 99 to
3     the witness.)
4  Q. I believe this is the First State-prepared
5     list of audits that you attended. Does
6     that square with your recollection
7     generally?
8  A. Generally, but again I do audits or go to
9     many different reinsurers, and the exact
10    dates, I remember some. You know, they
11    tend to melt together, what happened at
12    any one given audit. But I do -- I have
13    been to the Hartford location multiple
14    times and reviewed files there.
15 Q. If we can step back for just a second,
16    you're responsible for deciding whether a
17    given claim that has been presented to any
18    of the companies that you have
19    responsibility for is going to be audited?
20    Right?
21 A. If it -- if the claim is assigned to me,
22    I'll make -- I may make that call, decide
23    whether something needs to be audited. We
24    would look at a general book of business.

Page 566

1     If balances are creeping up and we're not
2     getting responses to our inquiries, we try
3     to set up an audit to try to clear out
4     those balances to move on, to try to shut
5     down the claims and keep moving on.
6  Q. Would it be fair to say that at least in
7     part the frequency of audits of First
8     State/Hartford over the last five, six
9     years has been as a result of the activity
10    associated with that book of business,
11    meaning that it has been active?
12 A. Yes. It is an active book. It involves
13    most of the entities that we represent.
14    What we do is we look at the individual
15    claims, and the individual claim handlers,
16    whoever may be handling it at one given
17    time, is attempting to resolve the issues
18    within those claims, and if the amount of
19    that book of business starts to grow, we
20    try and short-circuit all of the what may
21    be happening with nonanswer of questions,
22    not answering letters, and requests for
23    information, by going to the ceding
24    company and seeing the source documents

Page 567

1     and getting our answers from their files.
2     We find that going ahead and
3     doing that helps clear up issues. It ends
4     the -- it ends a lot of the questions back
5     and forth. And if a ceding company
6     provides us with everything, it makes it
7     quite easy, and we do that with many, many
8     ceding companies, and it works quite well.
9  Q. Does Nationwide/Wausau/National Casualty
10    have as its objective -- and I assume you
11    would be the one to set this policy if it
12    existed -- are claims audited for the
13    purposes of finding reasons not to pay?
14 A. Absolutely not. We're just trying to
15    clear the balances. We are in run-off,
16    and we're trying to run off the claims.
17    We're trying to close them down.
18 Q. Maybe it would be helpful if you could
19    explain to the Panel our claim handling
20    philosophy, generally speaking.
21    MR. GURA: If I could object,
22    when you say "our," could you just -- when
23    you say "our," what are you referring to?
24    MR. KAREKEN: Nationwide,

Page 568

1     National Casualty, the companies that you
2     have responsibility for.
3     MR. GURA: Thank you.
4  A. There is no written policy.
5  Q. Understood.
6  A. However, we're attempting to work through
7     our balances and work through what is
8     being billed to us in an efficient manner,
9     and by gathering information and looking
10    at these individual files, getting the
11    information we need, work through them and
12    get rid of them, and the way you do that
13    is either by paying them or, if they're
14    not payable, by denying them.
15 Q. And would you agree with the notion that
16    our philosophy is that we are the stewards
17    of the dollars that have been invested for
18    running off the business that we have
19    responsibility for?
20 A. Yes. We have been given the obligation or
21    the -- we have been given the job of going
22    out and running off this book of business,
23    and we're doing it in a manner which is
24    expeditious and in a manner which is

59 (Pages 565 to 568)

Page 569

1  sensitive to the financial criteria or the
2  financial impact it has. We are moving
3  forward as fast as we can in a sense to
4  put ourselves out of a job.
5  Q. But the primary objective -- you can tell
6  me if I'm wrong -- is that we're supposed
7  to pay what we owe and not pay what we
8  don't owe?
9  A. In its simplest terms, that's it, and do
10  it as quickly as possible.
11  Q. And that philosophy requires that we
12  understand what it is that is being
13  presented to us? Correct?
14  A. Exactly. That is why we ask questions,
15  get documentation, to understand the file.
16  Many of the claims that are coming to us
17  aren't auto claims. I mean these aren't
18  slip and falls where there is what is
19  going on. These are large coverage
20  actions being handled by the underlying
21  cedents with rooms full of documents for
22  one particular claim, and we have huge
23  claims coming to us for millions of
24  dollars, and in order to look at those

Page 570

1  claims, we have to get proper
2  documentation, analyze it, and then most
3  likely when they are bigger like that take
4  it up the chain to get support within our
5  company or within our management to pay
6  it, not unlike any other insurance or
7  reinsurance company when they get to these
8  types of large claims.
9  Q. Can you give the Panel a sense of the
10  relationship that you in your position as
11  reinsurance professional representative of
12  the Nationwide group of companies has had
13  with First State over the course of almost
14  10 years now?
15  A. Yes. Again we have attempted to elicit
16  information from First State via written
17  letters. Many times they have gone
18  unanswered. And so we attempted to go in
19  and audit, often by invitation, to come in
20  and get the documentation we need. Many
21  times when we arrive, there are large
22  claim files there filled with documents
23  which are not necessarily germane to the
24  claim. These are the underlying reports

Page 571

1  of why plaintiff, 42, John Jones, had
2  meso, and shows his medical report, or why
3  one particular site had an engineering
4  report. It has been difficult. We have
5  -- every time we go, it is sort of like,
6  "Okay, show us the real file, show us the
7  -- show us the DJ file."
8         "Oh, you want the DJ file?
9  Okay." Then they bring that out.
10         "Do you want the account file?"
11         "Fine."
12         We will look at that. We will
13  look on ECLIPS and notice it references
14  another file. We will go and look at that
15  file.
16         So what happens is we end up
17  going there and answering our questions
18  that we have, gathering information we
19  need, to go back, analyze, look at it, get
20  the proper authority, and move forward.
21         And, you know, as I heard
22  Mr. Wigmanich say it today, he said you
23  guys, come out, get the stuff you need,
24  and pay usually. And that's what we have

Page 572

1  been doing from since '95 for Argonaut.
2  Then from '96 on, that is what we have
3  been trying, attempting to do, is get the
4  information we need to move forward, and
5  that is what generally happened up until
6  about 2000 when they started to say,
7  "Well, sensitive documents we don't want
8  you to take home; we don't want you to
9  have copies of."
10         So we started to protest that,
11  and say, "No, we need the copies. We
12  need" -- I mean these are documents of DJ
13  files that go on for 10 years and then are
14  finally settled. There are 100 different
15  attorneys' reports. There are case
16  management reports that are filed
17  quarterly, and there are tons of them.
18  For us to sit there and scribe them all
19  out or be able to understand what they are
20  and bring them back to our management and
21  describe them is almost impossible.
22         This just isn't a file like
23  this. It is a room full of documents with
24  things going on and on. And this is after

60 (Pages 569 to 572)

Page 573

1  we, you know, work very hard with the
2  staff at Hartford to gather all of that
3  information and get the files off the --
4  it may be the adjuster's desk or wherever
5  they may be to look at these. When they
6  start throwing in "You can't have this,"
7  we protested.
8          At one point, I worked with
9  Mr. Wigmanich, who -- who said, yes, you
10 know, we understand that you have this
11 need for these documents, and one
12 particular case, he and I struck a deal
13 where he would give me the documents, and
14 then we ended up settling the case, and he
15 signed off on a settlement that said that
16 they would not unreasonably refuse our
17 requests for privileged documents. So
18 that was about 2001.
19         And then getting into 2002, they
20 started to again unreasonably withhold
21 documents. They started to not allow us
22 to have privileged documents. And now
23 Mr. Gura said we are no longer allowed to
24 have any documents whatsoever that may be

Page 574

1  privileged.
2          And one of the other things is
3  many times I have attempted to argue with
4  Mr. Noga and Mr. Wigmanich and other
5  people on site at Hartford or -- or Mr.
6  Wigmanich is up here in Boston -- but at
7  Hartford while we are trying to do this
8  that these documents aren't even
9  privileged, because they are
10 communications between their claims
11 handlers or nonprivileged documents, and
12 they said, "Well, they're still sensitive,
13 so we still just don't want to show them
14 to you."
15         We attempted to work through
16 that. I thought we had it worked out.
17 Then by 2002 they were back at it again,
18 not showing us or not allowing us copies,
19 number one, and again it is very
20 difficult. Every audit you go to there,
21 there is a room full of documents, but
22 those documents may or may not be
23 responsible for what you need. And you're
24 not -- many times it is -- you say there

Page 575

1  has got to be more. Well, there isn't.
2  We're told, "This is all there is." And
3  you can't get any more.
4  Q. You state that you're aware of the changes
5  that have taken place in terms of access
6  to information. Do you recall in
7  conducting audits that you were advised in
8  advance about what the rules would be?
9  A. As a matter of fact, no. The idea was,
10 well, mark them down, and we can work it
11 out. Put them down on the sheet,
12 everything that you want, tag them, and
13 then we can discuss it, sort of like we
14 had done with I believe it was the Waste
15 Management case, which was a large
16 environmental case, and Bill and I worked
17 through it, and I identified certain
18 documents I wanted that we had tagged,
19 that I was able to get my hands on, look
20 at, get the necessary authority I need,
21 and settle that case with Bill.
22         It comes down to being able to
23 get the documents you need to do your job
24 as a claims handler, to analyze these

Page 576

1  claims, and make a determination to move
2  forward. This just puts up roadblocks to
3  try to do that process, and it is really
4  unfortunate that these roadblocks are now
5  put up, that we are not allowed to have
6  anything privileged, I assume anything
7  sensitive, and that what we are going to
8  be able to see is very little, because
9  that is where all the, you know, that is
10 where all the good stuff is, where the
11 attorneys are talking to each other, the
12 clients are talking to the attorneys, they
13 are discussing strategy, they are going
14 back and forth. That is where the meat
15 and potatoes of the claims information is.
16 Q. Have you considered the history of this,
17 and more specifically in the context of
18 this case and these claims, how these
19 policies that First State has implemented
20 correlate to National Casualty's rights
21 under the contract that it signed with
22 First State?
23 A. Yes. I mean clearly they're breaching the
24 access to records. It clearly states that

Page 577

1  we shall have access to the records. I
2  heard Mr. Wigmanich talk about, well, it
3  doesn't say we can withhold. Well, there
4  is no qualifier. It says we have access
5  to records. They can't unilaterally
6  change the contract 25 years later. I
7  mean that is ridiculous.
8       I understand they have concerns.
9  Other cedents have had concerns in the
10 past over the same issues, and we have
11 always been able to work it out. In the
12 past, we have also worked it out with
13 First State. But now --
14      And I still don't understand.
15 They claim that it is related to asbestos
16 nonproducts, but I understand from what
17 Mr. Wigmanich said that now -- and what
18 Mr. Gura said -- that now we can have
19 nothing regarding any claim, whether it be
20 -- whether it be nonproducts or not.
21 Q. You mean we can't have access to any
22    privileged?
23 A. Exactly.
24 Q. You can't have any claim information?

Page 578

1  A. Exactly.
2  Q. Do you have an understanding, aside from
3     the access to records clause, why
4     information and complete information is
5     important for us to be able to do our job?
6  A. It is what we do as claim professionals.
7     It is what Mr. Wigmanich does as a claims
8     professional. It is what the whole
9     industry does as claims professionals.
10    They gather information; they analyze it;
11    and they make a call. And without the
12    information, without being able to see it,
13    without being able to see the meat and
14    potatoes of those claims files, you can't
15    do your job as a claims professional. It
16    puts a roadblock up to say, "Well, you
17    can't see it all, so just pay it." Well,
18    that's --
19 Q. And -- I am sorry?
20 A. No one in the industry does that, and the
21    only other -- the only other place where
22    that has come up, as they have talked
23    about, is with The Travelers, and that's,
24    you know, the only other ceding company we

Page 579

1  have, and we have hundreds of ceding
2  companies to us, that actually won't have
3  us -- won't give us any documents that
4  they claim to be privileged. First they
5  claim they don't have them. Then when we
6  discover some, they say, in fact they're
7  privileged; you can't see them.
8       But that -- the industry works
9  with people exchanging information and
10 going forward and working on claims, and
11 that's 99 percent of the industry does
12 that.
13 Q. You have looked at the treaties at issue
14    in this case, and did you see in any of
15    those three where National Casualty had
16    been granted the right to dictate to First
17    State which risk it would underwrite and
18    cede to the treaty?
19 A. No. They have underwriting and claim
20    control, and our only -- the only thing we
21    have rights under our contract would be
22    the right to come in and look and see what
23    they're doing, see what they're doing for
24    claims, see what they're doing for

Page 580

1  underwriting, and that's why the access to
2  records is so important is they have claim
3  and underwriting control over these
4  specific claims.
5       MR. KAREKEN: I don't know if
6  the original is up here. I will hand you
7  my copy of Exhibit National Casualty 147,
8  the Strain definition of utmost good
9  faith.
10      (Handing NC Exhibit No. 147 to
11 the witness.)
12 Q. I wonder if you could explain to the Panel
13    how you place that definition into this
14    access to information, change in policy,
15    no-you-can't-have-anything type of stance
16    that we're being confronted with.
17 A. Clearly Strain's definition here is right
18    on point. As a graduate of the Strain
19    seminar, I would wholly endorse it. But
20    also it talks to, you know, the idea of --
21    he misspells it here -- but candor and
22    openness, good faith, absolute and perfect
23    candor, honesty, openness, absent of any
24    concealment, however slight.

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030   (800) 655-3663

Page 581

1  In order for us to do our job,
2  there has to be this ability to go in and
3  see what they're doing, and for them to be
4  open and honest, and they're not being
5  open. They're not allowing us to see what
6  they're doing. Again these are the --
7  these are -- the documents that we're
8  trying to look at are the documents which
9  they claim privilege to are the meat and
10 potatoes of these claims. That's the --
11 the discussions with counsel are
12 discussions with internal counsel, the
13 discussions between each other that
14 discuss their positions, and those are the
15 ones they don't want to show us, and in
16 the absence of those type of documents,
17 we're left with -- and pollution claims, a
18 bunch of environmental site files, or in
19 asbestos, you know, maybe some CCR
20 reports, and that's about it, or whoever
21 is handling the claim, the underlying
22 claims.
23     So we end up in a situation
24 where there is no utmost good faith here.

Page 582

1  There is no -- there is active concealment
2  of what they're doing. There is no
3  openness. There is no disclosure of all
4  relevant facts. And we signed an
5  agreement a long time ago which provided
6  for access to records, and they're now
7  breaching that. They're attempting to
8  change the contract, and they shouldn't be
9  able to do that.
10 Q. What do you think about the idea that was
11    alluded to and/or stated expressly by
12    Mr. Wigmanich that in effect once you get
13    their reinsurance report we have all the
14    information we need?
15 A. Well, reinsurance reports from The
16    Hartford vary from handler to handler, but
17    basically, they're making conclusions.
18    They will just say this is the conclusion
19    and this is what we paid, so you now pay.
20    You still have to look at the underlying
21    documents that support that to understand
22    the claim, to see how it got from the
23    initial whatever its filing of DJ or
24    demand for coverage to the point where it

Page 583

1  ended. They just have a synopsis of what
2  happened in the end. We need to know the
3  whole story to see what happened, to
4  understand the claim, to see where it
5  ended up, so we can make a call on it on
6  what to do. As Bill said, after we have
7  had that full disclosure, we usually pay.
8  That's what we do.
9  Q. Okay. And other than perhaps the claims
10    at issue here, okay, which if you remove
11    OCF from doesn't amount to a grand --
12    grand sum of money, would you agree?
13 A. I would agree.
14 Q. And OCF we issued denial on in what year?
15    Do you recall?
16 A. 2001 or 2002. 2002, I believe.
17 Q. So it was denied obviously before the
18    arbitration demand for resolution of that
19    claim?
20 A. Correct.
21 Q. What do you think about the idea which
22    seems to be the centerpiece of First
23    State's position which is that since we
24    have been shown the privileged documents,

Page 584

1  okay, and we haven't said, well, in this
2  one that we saw there was such and such
3  and, therefore, ipso facto, okay, the idea
4  that we should have to argue to this Panel
5  or any Panel that we saw a document, that
6  we claim that it contains certain
7  information, but not be able to show the
8  Panel what it is and allow them to see
9  whether they agree with our interpretation
10 or not?
11 A. Well, I think it was important to note
12    that, you know, that there is a
13    representation that we have seen
14    everything on there, but we don't know
15    that. In fact, when we go and look at
16    individual files, especially prior to the
17    arbitration demand, you know, as I said
18    before, it is difficult to get the
19    documents. It is difficult to get the
20    files. We have been given partial files,
21    or we can't find this. We have had --
22    when we go to Hartford, they say it is in
23    Boston. When we go to Boston, they say it
24    is in Hartford. We can't be sure what

63 (Pages 581 to 584)

Page 585

1  we're getting from time to time when we go
2  there, number one.
3      And number two, the idea that we
4  may not have seen it flies in the face of
5  when we go there we're looking at these
6  individual claim files, and we find
7  something good, and our instructions are
8  to tag it, and we'll talk about maybe if
9  we'll produce it or not, and, you know, we
10 had the assurance by Mr. Wigmanich in
11 writing that we won't unreasonably
12 withhold privileged documents, and that
13 was in 2001 that he did that.
14     So, you know, we're looking at
15 the OCF claim. I think it is fair to
16 assume that it is a big claim, and we're
17 going to want privileged documents, and,
18 you know, to say that we have them or we
19 shouldn't be able to view them is
20 ridiculous, because again it is a huge
21 claim with lots of documents, and, number
22 one, we don't know what is on the
23 privilege document list is stuff we
24 actually saw, and number two, of course

Page 586

1  anyone looking at the file wouldn't be
2  sitting there taking down verbatim what
3  was there because we understood from
4  Mr. Wigmanich that they, First State,
5  wouldn't unreasonably withhold documents.
6  Q. And you have looked at the privilege log
7     in this matter, haven't you?
8  A. Yes.
9  Q. Can you tell from looking at that log
10    whether anything on there is anything that
11    you saw in connection with any of your
12    audits?
13 A. No. Looking at it, you can't tell what
14    claim it goes to, if it is A. H. Robins or
15    OCF. There is the one with the Bowman one
16    that kind of -- Mr. Gura has said is that,
17    and there is an assumption that it is
18    that, but we don't know if it is or is
19    not. Again we don't know what claims they
20    go to. We don't know if there are files
21    or documents withheld, to what claim, or
22    for what purpose, or -- it is too
23    ambiguous to know.
24 Q. Now you heard my discussion with

Page 587

1  Mr. Wigmanich about the concept of follow
2  the settlements and follow the fortunes.
3  Do you remember hearing that?
4  A. Yes.
5  Q. And I tried to draw a distinction for
6     Mr. Wigmanich between what is an
7     acceptable application or what follow the
8     settlements is intended to apply to versus
9     something to which it does not apply. Do
10    you recall my general discussion in that
11    regard?
12 A. Yes.
13 Q. Do you recall that I said that it is one
14    thing to tell the ceding company that they
15    shouldn't have settled or that they
16    shouldn't have settled on a particular
17    basis, being that we don't owe it because
18    you did that?
19 A. Correct.
20 Q. Versus saying to the ceding company, you
21    settled the claim, that's fine, okay. We
22    don't quibble with the fact that you had
23    to make a choice about what you were going
24    to do. But when you bring the loss to us,

Page 588

1  follow the settlements doesn't override
2  the terms of our contract with you; in
3  other words, follow the settlements does
4  not allow you to supersede, overrun,
5  overcome terms that are spelled out in the
6  treaty? Is that --
7  A. That's correct.
8  Q. And has that been your understanding of
9     the way that follow the settlements
10    operates since you became familiar with
11    the concept?
12 A. Yes. And we're not second-guessing the
13    decision to settle or the underlying
14    amounts or that a particular site had so
15    much damage at it or that these BI
16    asbestos claimants were in fact injured or
17    not. We're not second-guessing that.
18 Q. And you have seen the various letters that
19    have been identified as our denials?
20 A. Correct.
21 Q. And presumably you would have seen those
22    before they were even sent? Correct?
23 A. I guess that's a fair assumption.
24 Q. Well, you may or may not have?

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030   (800) 655-3663