```
 1   ******************************************

 2   IN THE MATTER OF THE ARBITRATION BETWEEN

 3   FIRST STATE INSURANCE GROUP,

 4                     Petitioner

 5   and

 6   NATIONAL CASUALTY COMPANY,

 7                     Respondent

 8   ******************************************

 9                     VOLUME:  III

10                     PAGES:   694-1140

11

12   BEFORE PANEL MEMBERS:

13            R. Michael Cass, Chairman

14            Paul N. Steinlage

15            Dennis C. Gentry

16

17   Date:     Thursday, February 12, 2004

18   Held at:  Wyndham Hotel

19             89 Broad Street

20             Boston, Massachusetts

21   Commence: 8:30 a.m.

22

23   Reporter: Judith McGovern Williams,

24             CSR, RPR, CRR
```

Page 963

1  that you begin to look at and consider and
2  put it into your framework.
3       CHAIRMAN CASS: Okay. That's
4  all I have.
5       ARBITRATOR GENTRY: Did we
6  stimulate you guys?
7       MR. KAREKEN: Nothing further
8  from me.
9       MR. GURA: One quick question on
10 Grace.
11      FURTHER RECOSS EXAMINATION
12 BY MR. GURA:
13 Q. I believe you agreed that the liabilities
14    for Grace exceed the coverage?
15 A. I believe they do. Yes.
16 Q. If the liabilities exceed the coverage,
17    they are going to blow through their
18    coverage, but whether the coverage is 50 X
19    of 100 or 40 excess of 80? Correct?
20 A. Yes.
21 Q. Okay. And so, therefore, instead of
22    paying your percentage of the 50 million,
23    you would pay, because they are going to
24    exceed -- they are going to blow through

Page 964

1  that layer anyway, what happened here was
2  you are paying your percentage of
3  40 million; isn't that right?
4  A. Well, let me clarify an earlier answer, I
5     guess. I may have answered too quickly to
6     your answer, but. While Grace will blow
7     through that coverage block, because they
8     have billions of dollars of exposure
9     potentially, they will not blow through
10    AIG's coverage, because that has been
11    capped at 80 percent. They will never
12    reach 100 percent payments against AIG's
13    coverage, which is the concession that
14    First State received.
15 Q. Had they not capped their exposure at
16    80 percent, you would have paid your
17    percentage of 50 million instead of your
18    percentage of 40 million; isn't that
19    right? The settlement benefitted AIG,
20    NERCO, and NERCO's reinsurers; isn't that
21    right?
22 A. The settlement benefitted AIG. They paid
23    20 percent less. The billing to First
24    State, as I indicated, they didn't benefit

Page 965

1     from that if they had gone with a ground
2     up approach and would have paid 5 million,
3     in my example, instead of 8 million.
4  Q. But would you have eventually paid, if
5     they didn't do that deal, the full amount?
6  A. We're not talking about if they hadn't
7     done the deal. We're talking about with
8     the deal they did, what is the proper way
9     to apply those payments, and the proper
10    way to apply those payments -- again in my
11    opinion -- is that you would only get -- I
12    know we are picking numbers again -- but
13    it is 5 million instead of 8 million. It
14    is something less than the way it was
15    presented. So you wouldn't have gone
16    through it, because it was capped. A
17    settlement was entered into. The question
18    is what do you do with the settlement
19    dollars in terms of ceding it to
20    reinsurers.
21 Q. You should cede it in a manner different
22    than the way you settled it is what you
23    are suggesting?
24 A. No. AIG paid up to 80 percent of their

Page 966

1     limits. As we have discussed, there was
2     nothing in the settlement agreement that
3     suggested that the way you do that is you
4     put 80 percent into the first policy and
5     then skip to the next policy.
6  Q. All right.
7          MR. GURA: I don't have anything
8     further.
9          CHAIRMAN CASS: Thank you,
10    Mr. Myhrer. Well, you're finished.
11         MR. KAREKEN: Yes, yes, yes.
12         THE WITNESS: Thank you.
13         (Witness excused.)
14         (Witness sworn.)
15         HANNAH HURYK, SWORN
16         DIRECT EXAMINATION
17    BY MR. KAREKEN:
18 Q. Good afternoon, Ms. Huryk.
19 A. Hello.
20 Q. Hannah, you are a manager with Nationwide
21    Indemnity regarding assumed reinsurance
22    business? Is that right?
23 A. That's correct.
24 Q. And your unit is the asbestos long-term

Page 971

1  insurance career.
2  Q. The work that you did with Cigna was
3     direct coverage; correct?
4  A. That is correct.
5  Q. And general liability?
6  A. I did general liability, and I also did
7     excess and surplus lines liability.
8  Q. Okay. And when you first came to Wausau,
9     you were working in the reinsurance
10    assumed department, but were handling
11    environmental claims; correct?
12 A. That's correct.
13 Q. You were designated to testify at this
14    proceeding regarding the reasons why
15    National Casualty believes that it is not
16    responsible for paying the OCF claim as it
17    has been ceded to National Casualty under
18    the respective treaties?
19 A. That's correct.
20 Q. And correct me if I am wrong, Hannah, but
21    you have been involved with respect to
22    OCF, asbestos nonproduct billings that
23    come into our office from many different
24    sources; correct?

Page 972

1  A. That's correct.
2  Q. Okay. And you had responsibility for
3     dealing with the OCF cession we received
4     from First State?
5  A. That's correct.
6  Q. From the time that basically we learned
7     that First State would be sending us,
8     ultimately, an OCF presentation?
9  A. Yes.
10 Q. And you were the lead person in that
11    respect; correct?
12 A. That's correct.
13 Q. So that the communications between
14    National Casualty and First State about
15    OCF, both the direct coverage and the
16    two assumed claims for International and
17    Aetna, were your responsibility on a
18    day-to-day basis?
19 A. Yes. That's correct.
20 Q. And there came a point in time when you
21    decided that you, on behalf of National
22    Casualty, needed to look at more than what
23    had been provided to you at that point by
24    First State? Is that right?

Page 973

1  A. Yes. That's correct.
2  Q. Do you recall approximately when that was?
3  A. Well, that would have been in -- at some
4     point in the 2001 year. My specific
5     recollection is that at some point in
6     2000, the early part of 2001, we received
7     the notice of claim billing from First
8     State. It involved the three cessions,
9     their direct settlement, their settlement
10    on behalf of International, and their
11    settlement on behalf of Aetna. Without
12    reciting all of the detailed information,
13    I think that Bill Wigmanich did a fair job
14    in explaining to you what the nature of
15    all of those issues and what the claim was
16    about. It was a fair recitation, so I
17    won't go into all of that with you.
18        At some point, we noticed that
19    this is a very complex matter. It took
20    First State years to fully evaluate and
21    adjust. It took International years to
22    adjust. It took Aetna many years to
23    adjust.
24        And so, having a need to audit

Page 974

1  this claim and go out and understand what
2  went on and how it was handled, we
3  determined that we needed an audit. It
4  often takes us, oh, six, eight, maybe
5  ten weeks to schedule an audit with First
6  State to get a date, to prepare our files,
7  to allow them to prepare their files and
8  gather them up for our audit. So the
9  audit was conducted in October and
10 November of 2001.
11     I believe it was introduced into
12 evidence the schedule that showed who went
13 on what audits, and I did attend the audit
14 in Boston and the audit in Hartford
15 specific to Owens Corning personally back
16 then.
17 Q. And you were the one who actually looked
18    at materials provided at that point
19    regarding Owens Corning? Correct?
20 A. That's correct.
21 Q. At some point after that, did you
22    communicate further with First State about
23    your view of what you had seen or what you
24    thought of their presentation?

71 (Pages 971 to 974)

Page 975

1  A.  Well, during the audits, as we gathered
2     documentation, we looked at the files in
3     Boston, and we looked at the files in
4     Hartford. There was a substantial amount
5     of information provided to us the first
6     time, and I will say that the material
7     that I put on my photocopy request forms
8     is material that I saw.
9          We have had a lot of
10    disagreement, I think, about what does
11    seeing and reviewing and having an
12    opportunity to obtain information and
13    analyze information mean. I went there.
14    I spent days tagging documents in Hartford
15    and days tagging documents in Boston. I
16    even spoke to -- went so far as to speak
17    to the claims examiners in Boston to
18    determine what went on, what -- how they
19    got to their settlement. And I would like
20    to talk a little bit about some of that.
21         ARBITRATOR GENTRY: This was in
22    2001?
23         THE WITNESS: This was in 2001.
24         ARBITRATOR GENTRY: Thank you.

Page 976

1  A.  The Aetna settlement in Boston, we went
2     and looked at the NERCO file for the Aetna
3     settlement. It was clear to us that NERCO
4     was raising much the same issues that we
5     were raising; the issue over the number of
6     occurrences, the basis of the settlement,
7     the access to records. The correspondence
8     is in your binders. It is voluminous.
9     And the requests from NERCO to Aetna are
10    the same sorts of things we looked at.
11         When they finally settled with
12    Aetna, I saw no documentation in the
13    claims file which gave me reason to
14    believe that the 30 percent discount they
15    got was based on anything. So I asked --
16    I talked to Paul Higgins, and Mr. Lagana
17    was in the room when I talked to Paul
18    Higgins, and my notes of those
19    conversations are also in your binders.
20         Mr. Higgins -- my recollection
21    of my conversation with Mr. Higgins, and I
22    am sure I will get an opportunity to look
23    at the notes and talk about exactly what
24    it is they say -- is that he did no

Page 977

1     analysis of their chances of winning on
2     any of the issues that were involved.
3     That he would talk to Steve Bencher, and
4     he would tell Steve Bencher that he would
5     never give him more than 50 percent.
6     Steve would say, I'm not going to take
7     less than 80 percent, or something like
8     that. Ultimately, they -- the
9     conversation went higher than Paul and
10    Steve Bencher. It went to a level of
11    management higher than the two of them,
12    and that ultimately they agreed on 70
13    percent. Paul never represented to me
14    that the basis was anything other than a
15    negotiated settlement to make the claim go
16    away or that it was a single separate
17    occurrence.
18         Likewise with the International
19    claim cession. When I looked at their
20    files, Mr. Dowd wrote several letters
21    asking for information, explanation,
22    documentation relative to their positions
23    in the litigation between -- an ADR
24    between International and Owens Corning.

Page 978

1     The file went right up to December of
2     2000. And
3     in December of 2000, as you heard
4     Mr. Wigmanich testify to, they agreed to
5     pay a portion of the billing and arbitrate
6     the balance, and the idea being that if
7     the arbitration panel determined if NERCO
8     didn't owe it, then they would get money
9     back, and if the arbitration Panel agreed
10    -- decided that they did owe it, they
11    would pay more.
12         Well, there was nothing in the
13    claim file after that letter except for
14    the check request that you have seen
15    yesterday or earlier this week when
16    Mr. Wigmanich was testifying, and that
17    check request says when we pay them,
18    they'll pay us. And it seemed to us at
19    the time that that was actually the basis
20    of their settlement with International.
21    When we pay them, they'll pay us.
22         I talked to Mr. Dowd, and at the
23    time -- and you see my notes are in the --
24    I did take notes of that conversation as

Page 979

1  well, and those notes are in there. At no
2  time did Mr. Dowd suggest to me that the
3  settlement was predicated on a single
4  separate occurrence. There were internal
5  conversations.
6      "Mr. Dowd, is there any notes or
7  information, subject, that describes your
8  internal conversations?"
9      "No. There was no notes. There
10 is nothing kept. We talked -- we had
11 several conversations. You know, the
12 claims came in, and things were
13 developing, and ultimately we decided to
14 pay it."
15     That is my understanding of how
16 they settled that claim.
17     I have to say that I was
18 surprised to hear Mr. Wigmanich say this
19 past week that their decision to pay First
20 State directly influenced his decision to
21 pay the International claim. That when
22 they paid them, they -- when First State
23 paid them, International would pay First
24 State. I didn't understand anything about

Page 980

1  it being through Odyssey. Maybe that is
2  true. I'm not sure. I really wasn't
3  clear on that. But it seemed to me that
4  Mr. Wigmanich's testimony earlier this
5  week indicated that the International
6  settlement was not settled on its merits
7  or on --
8      MR. GURA: I would object.
9  First of all, the witness is testifying on
10 what Mr. Wigmanich or the Panel will
11 evaluate what Mr. Wigmanich said about the
12 testimony offered at the hearing.
13 Obviously, I think I would also object
14 that the witness is mischaracterizing
15 Mr. Wigmanich's testimony.
16     MR. KAREKEN: I believe she is
17 entitled to give her opinion on it. It is
18 her own understanding of what he said.
19     ARBITRATOR GENTRY: It was a
20 surprise to me. That's why I -- my
21 eyeballs were getting wide, because I
22 didn't hear him say that, but I understood
23 that that was a part of the -- there was a
24 relationship there where checks did go

Page 981

1  back and forth, but I didn't hear him say
2  it was a quid pro quo. Is that what you
3  are saying he said?
4      THE WITNESS: That was my
5  understanding of what he said.
6      MR. GURA: Exactly the opposite.
7      THE WITNESS: That is my
8  understanding of what the reason for
9  payment on the check request was.
10     ARBITRATOR GENTRY: Okay. Fine.
11 That was your understanding.
12 A.  When I visited Hartford, there was a
13 substantial amount of information
14 provided. Again, this is October or
15 November of 2001. When we went there, I
16 took some notes. The notes are in the
17 binder. You know I took some notes.
18 There is no dispute I took some notes.
19 But it took me three days to go through
20 the material that was originally provided
21 to us, and there is no way that I would
22 have reviewed and analyzed every piece of
23 paper in that claim file at the time that
24 I visited.

Page 982

1  Q.  Could I stop you there for just a second?
2  A.  Sure.
3      Can anybody stop me?
4      ARBITRATOR GENTRY: There has to
5  be a certain amount of control here.
6      (Laughter.)
7  Q.  I think it was introduced into evidence
8  yesterday. It is a document, First State
9  101.
10     (Handing FS Exhibit No. 101 to
11 the witness.)
12 Q.  The only reason I bring it up is -- this
13 is a letter that was directed from
14 Ms. Rackle to Mr. Schaefer regarding the
15 audit that you're describing?
16 A.  That's correct.
17 Q.  And your request for information?
18 A.  That's correct.
19 Q.  And the reason I bring it up is you were
20 the one who was doing the review of the
21 Owens Corning materials?
22 A.  That's correct.
23 Q.  So that in terms of the items listed here
24 that were requested, you were the one

73 (Pages 979 to 982)

Page 983

1  making those selections?
2  A. That's correct.
3  Q. Okay. On the cover letter, it says, "As
4     you are aware, it is our policy to remove
5     all privileged and confidential
6     documents"?
7  A. That's what the letter says. Yes.
8  Q. Okay. If you look at First State 102,
9     there was some testimony yesterday
10    concerning that.
11         (Handing FS Exhibit No. 102 to
12    the witness.)
13 Q. Was it your understanding when you were
14    examining the files related to Owens
15    Corning that privileged and confidential
16    materials were going to be withheld from
17    you?
18         MR. GURA: I am going to object
19    again on the same grounds. Mr. Cass
20    advised us not to -- you asked me
21    yesterday to move on on that document and
22    not delve further into it. Now he is
23    trying to elicit testimony from this
24    witness on this document when the

Page 984

1  agreement was between Mr. Schaefer and
2  Mr. Wigmanich and the Panel was taking it
3  for whatever it was. To now ask a party
4  not part of that agreement I think is
5  improper, especially when I was asked to
6  move on when questioning Mr. Schaefer
7  BY MR. KAREKEN:
8  Q. Were you aware of that item?
9  A. I was aware.
10        MR. GURA: I am going to object.
11    I think it is inappropriate, especially
12    since we never got this document in
13    discovery, and we couldn't ask her about
14    it.
15        MR. KAREKEN: I didn't ask her
16    about the document. I said was it your
17    understanding that privileged and
18    confidential materials were going to be
19    withheld as described in 101.
20        MR. GURA: No. He put that
21    document in front of her -- he put that
22    document in front of her, which was a
23    document which wasn't produced in
24    discovery, and so I totally disagree to

Page 985

1  his characterization. I object to any
2  questioning of this witness on this issue.
3         CHAIRMAN CASS: We are going to
4  let him ask that question.
5         MR. GURA: Which is the question
6  that he can ask?
7         MR. KAREKEN: I just asked.
8  BY MR. KAREKEN:
9  Q. When you were conducting your review in
10    October, November -- I don't remember if
11    you said --
12 A. 2001.
13 Q. -- were you advised when you were tagging
14    materials and conducting your review, was
15    it your understanding that you were not
16    going to receive privileged and
17    confidential materials?
18 A. It was my expectation that they would not
19    be unreasonably withheld. This is a claim
20    that had been settled. This is the first
21    audit that we had conducted subsequent to
22    this agreement between Mr. Schaefer and
23    Mr. Wigmanich. It was a substantial
24    amount of information. The claim was

Page 986

1  settled. We had this agreement that it
2  would not be unreasonably withheld, and I
3  had no expectation that they would
4  withhold.
5         MR. GURA: Objection. The
6  agreement doesn't say anything about
7  privileged and confidential. We went
8  through that yesterday, and I was
9  specifically asked not to question further
10    on it. Now this witness, he has gotten in
11    the door she somehow had an understanding
12    that we would be producing privileged and
13    confidential documents, when the only
14    testimony that has ever been elicited
15    here, including from Mr. Myhrer, is that
16    we have never photocopied and made copies
17    to the other side of the privileged and
18    confidential documents, even though we had
19    given them the right to look at them in
20    the past. This is totally improper. We
21    have never been granted any discovery on
22    the document.
23        MR. KAREKEN: We --
24        MR. GURA: I am speaking.

74 (Pages 983 to 986)

Page 995

1  the National Casualty examiner in
2  preparing the correspondence. But
3  National Casualty was not my
4  responsibility at that time. If you will
5  look at the letter, the Wausau letter
6  probably has my name on it -- the Wausau
7  letter definitely has my name on it, and
8  the National Casualty does not. That is
9  not my signature, but was authored
10 primarily by me.
11 Q. Was it your intention in sending out a
12    letter in response to convey National
13    Casualty's view of the presentation that
14    had been made?
15 A. Yes.
16 Q. Do you consider the intent of the letter
17    that you have in front of you in terms of
18    its content and the position expressed to
19    be substantially different than what is
20    being argued in this case at this point
21    regarding why National Casualty believes
22    it doesn't owe the OCF presentation?
23 A. Could you read that back to me? That is a
24    long question.

Page 996

1  Q. Let me ask it a different way. You have
2     reviewed the briefs that were presented on
3     behalf of National Casualty in this case;
4     correct?
5  A. Yes. That's correct.
6  Q. Do you believe that those briefs and the
7     arguments they express or positions that
8     they take to be inconsistent with the
9     conclusions you drew back in 2002?
10 A. No.
11 Q. Would you explain to the Panel why you
12    believe that National Casualty isn't
13    obligated to fund the OCF presentation
14    made by First State?
15 A. Well, one, because we do not think that
16    the presentation as submitted is in accord
17    with the settlements as entered into by
18    First State and NERCO with regard to its
19    direct settlement and to its ceding
20    companies, Aetna and IIC. We have asked
21    them to define the occurrence for us. We
22    have asked them to provide us with the
23    records which demonstrate their cession.
24    We have reviewed material and taken some

Page 997

1  notes and talked to the claim examiners.
2  We have seen that there are -- we just
3  don't see that the settlement -- that
4  there is any agreement between the parties
5  that the settlement is predicated on a
6  single separate occurrence. We don't
7  understand how thousands and thousands of
8  claimants being injured from exposure to
9  asbestos during an operation from any time
10 from 1952 to 1972 in places all over the
11 country, and who the heck knows where
12 else, can constitute a single occurrence,
13 and when we reviewed the documents, we
14 didn't see anything to support that that
15 is the basis upon which First State
16 settled its direct claims or its claim
17 with Aetna or its claim with
18 International.
19     I believe Mr. Wigmanich
20 testified that they weighed a variety of
21 outcomes, zero occurrences, one
22 occurrence, one additional occurrence,
23 multiple occurrences, and came up with a
24 dollar figure to resolve, which would be

Page 998

1  something that they could live with, to
2  resolve the claim against them, and that
3  does not suggest to me that the basis for
4  the settlement is a single separate
5  occurrence.
6      We looked at -- I know Mr. Bill
7  Bowman's memo in here is amongst the
8  documents, and that memo says that this --
9  it is a post settlement memo, and it says
10 that the settlement is best viewed as
11 acceptance of OCF's position, and I think
12 the reason it has to be viewed that way is
13 because otherwise I'm not sure how or even
14 if First State would be able to make a
15 reinsurance recovery on this particular
16 loss.
17 Q. Now you mentioned in your testimony the
18    idea of defining the occurrence?
19 A. Yes.
20 Q. And you read Mr. Wigmanich's deposition
21    after it was taken in December? Correct?
22 A. I did review that.
23 Q. And it was your view that in response to
24    the questions that Mr. Wigmanich hadn't

77 (Pages 995 to 998)

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030   (800) 655-3663

Page 1007

1  you have on OCF? Pretty much?
2      MR. KAREKEN: I have another
3  maybe 15 minutes, so if you would like to
4  take a break. The other claims should go
5  more quickly, because they're not as
6  significant in terms of dollar values.
7      CHAIRMAN CASS: How are you
8  doing?
9      THE WITNESS: I am fine, thank
10 you.
11 BY MR. KAREKEN:
12 Q. So you have examined the briefs, correct,
13    I think you said?
14 A. Yes.
15 Q. And you understand that it's First State's
16    contention that National Casualty is
17    obligated to follow First State's
18    settlements as respects Owens Corning;
19    correct?
20 A. That's correct.
21 Q. Can you as briefly as possible -- because
22    we don't need to belabor the point --
23    explain to the Panel why we don't agree
24    with that assertion, "we" being National

Page 1008

1     Casualty?
2  A. Well, in our evaluation of claims, we
3     actually do want to follow their
4     settlement from the beginning to the end.
5     We want to see how it began, how it
6     developed, how it was evaluated, how it
7     was negotiated, and how it was settled,
8     and then we want to evaluate how it was
9     ceded to us, and in our evaluation of the
10    material that we were allowed to have and
11    the material that we were allowed to see
12    and our recollections of what that is and
13    my conversations with the adjusters, the
14    cession to us on a single separate
15    occurrence basis was not the manner in
16    which it was settled.
17 Q. Ms. Huryk, did you participate in the
18    audit that was conducted in late April,
19    early May, regarding the to-be-added
20    Exhibit C claims?
21 A. Yes, I was.
22 Q. All right. And OCF was not a part of
23    that; isn't that correct?
24 A. That is correct.

Page 1009

1  Q. And that's because OCF was part of the
2     original demand for arbitration that
3     occurred in May of 2002?
4  A. That's correct.
5  Q. And the actual document discovery, as
6     opposed to the audit in April-May, was
7     conducted, I believe, in August?
8  A. That's correct.
9  Q. And you were also a participant in that,
10    were you not?
11 A. That is correct.
12 Q. And that did involve production of
13    documents relative to Owens Corning;
14    correct?
15 A. It was supposed to.
16 Q. Okay. Now the Owens Corning documents
17    were supposed to be made available at the
18    Hartford location? Correct?
19 A. That's correct.
20 Q. And when you arrived there in August, were
21    the OCF documents available?
22 A. No. They weren't. Not the documents
23    related to the nonproducts claims. When
24    we arrived there in August of 2003 --

Page 1010

1     right?
2  Q. Yes.
3  A. -- there were a variety -- there were a
4     lot of boxes of Owens Corning materials.
5     There were boxes and boxes and boxes of
6     CCR reports relating directly to the
7     product liability portion of this claim.
8     We had already paid the product liability
9     portion of the claim. There were a
10    handful of claim files, also related
11    strictly to the administration of the
12    product liability claims.
13       When we asked Jackie Rackle,
14    where is the files related to the
15    nonproducts portion, there isn't anything
16    here related to nonproducts, she said she
17    didn't know. The file was lost.
18       I believe that Mr. Kareken wrote
19    correspondence while we were sitting there
20    looking for that information.
21       What ultimately happened is we
22    got -- I don't remember if it was one or
23    two boxes of photocopies of documents.
24    That was on Thursday, I think. They were

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030   (800) 655-3663

Page 1011

```
1    shipped to us from Boston overnight mail,
2    and I want to say it was Thursday. It
3    might have been Wednesday, but I think it
4    was Thursday. We were only given until
5    Friday to complete our document discovery.
6    And these, in my view, just don't
7    constitute the claim file. They were a
8    box of photocopies. They were Bates
9    stamped for a purpose. I don't know what.
10   They're not the claim file.
11          Did we have an opportunity to
12   see whatever was in the boxes? Yes, we
13   saw what was in the boxes. Yes, Mark
14   tagged what was in the boxes, you know,
15   some of the documents that were in the
16   boxes. We certainly were not given an
17   opportunity to review those documents.
18   And we had no expectation at that point
19   that they would not be produced to us for
20   our analysis and evaluation after our
21   document discovery period.
22          It was not until the Panel
23   issued its order -- and I want to say that
24   was in October -- and First State said,
```

Page 1012

```
1    "We're not going to give you those
2    documents," that we were made aware that
3    we would not have access to or be given
4    copies of those privileged documents or
5    whatever documents were in that box.
6           So, in my view, we were deprived
7    of the opportunity to see those things and
8    have a chance to evaluate and analyze
9    those documents. Even if we had been
10   given them, I would not testify here today
11   that we had been given a copy of the
12   files. In 2001, there was so much file
13   material related strictly to nonproducts,
14   it took me, by myself, three days to go
15   through. We got two boxes of photocopies
16   in August of 2003. It is not the files
17 Q. As opposed to the audit procedure, which
18   apparently has changed over time, did you
19   have the understanding when you went and
20   got the document discovery, as respects
21   OCF and A. H. Robins, that whatever we
22   were shown would not be photocopied and
23   produced to us of the items that we
24   requested?
```

Page 1013

```
1  A. No. I was of the expectation that what we
2     were shown and what we asked for copies of
3     we would be given.
4  Q. And in fact, your expectation was that
5     anything that they considered privileged
6     wouldn't even be produced to us and would
7     be identified on a log at some later
8     point?
9  A. That was my understanding.
10 Q. Now you have looked at the privilege log
11    that was produced by First State in this
12    matter?
13 A. Yes.
14 Q. And there is a copy of it up there, if you
15    want to refer to it, but the general
16    question that I have is that you looked at
17    the OCF file in 2001?
18 A. Yes.
19 Q. And you looked at some, one or two boxes
20    of stuff, in August of 2003?
21 A. That's correct -- well, we looked at them
22    together.
23 Q. Okay.
24 A. I think you will find that the August of
```

Page 1014

```
1     2003 photocopy requests, I think many of
2     them -- maybe all of them -- have your
3     name on them. We did document discovery
4     together. We would look at things and tag
5     them, and sometimes Mark would fill out
6     the photocopy request forms and sometimes
7     I would. It was a team effort. But yes.
8  Q. But the point being that you have seen the
9     OCF materials on two occasions?
10 A. Yes.
11 Q. Okay. And I guess the bottom line here is
12    that when you look at the privilege log,
13    okay, which does not identify the document
14    in terms of what claim it relates to, can
15    you determine that what you saw on the
16    request forms is in fact what is
17    identified on the privilege log?
18 A. I don't think that I would be able to do
19    that with any certainty.
20 Q. When you conducted your document review,
21    was it your understanding that you were
22    going to have to argue from documents that
23    you saw as to their content as opposed to
24    actually having it to be able to show to
```

81 (Pages 1011 to 1014)

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030   (800) 655-3663

Page 1015

1 the Panel?
2 A. Say that again?
3    CHAIRMAN CASS: Yes. I would
4 like to hear that one again, too.
5    MR. KAREKEN: Okay.
6 Q. You told me before that you had the
7 expectation of getting copies?
8 A. Yes.
9 Q. So you weren't anticipating that you would
10 see something there and then have to come
11 and argue to the Panel without the benefit
12 of the document?
13 A. That's correct.
14 Q. So it was your expectation to be able to
15 show the Panel what it was that you had
16 seen?
17 A. Yes.
18    MR. KAREKEN: If you wanted to
19 break before I move on to a different
20 claim.
21    CHAIRMAN CASS: This is a good
22 time. Very good. 4:15. How is that?
23    MR. KAREKEN: Sure.
24    THE WITNESS: Sure.

Page 1016

1    (Recess taken at 3:59 p.m.)
2    (Recess ended at 4:23 p.m.)
3    BY MR. KAREKEN:
4 Q. Hannah, let's talk for a minute about the
5 Shook & Fletcher claim.
6 A. Sure.
7 Q. It is your understanding that that claim
8 involves the same issue of nonproduct
9 asbestos being a separate single
10 occurrence?
11 A. Yes. That's correct.
12 Q. And the Shook & Fletcher claim was or
13 wasn't part of the original demand that
14 came in May of 2002?
15 A. It was not.
16 Q. Do you recall whether in fact you
17 examined, audited, investigated the claim
18 prior to conducting discovery in the
19 arbitration?
20 A. Yes. Actually, my recollection is that it
21 was audited as a part of our fairly annual
22 audit in October and November of 2002,
23 which led to my correspondence of
24 January 14, 2003.

Page 1017

1 Q. What exhibit are you looking at there?
2 A. This is No. 71.
3 Q. So it was one of the letters attached to
4 my July 18th letter?
5 A. Yes.
6 Q. And as a result of conducting your review,
7 I think on the second page of that letter,
8 you asked some questions; isn't that
9 right?
10 A. Yes. In fact, there are a number of
11 questions throughout the correspondence.
12 Q. And when you were there in 2002, did you
13 get the sense that you were being given
14 everything?
15 A. Well, it is a little bit more difficult to
16 answer, because it is clear that from my
17 correspondence that we were unable to
18 resolve a variety of issues after having
19 reviewed the claim file during our audit,
20 which is why the January 14th
21 correspondence raises a number of
22 questions. At the time that we were
23 there, the 2002 audit, we spoke about --
24 my recollection is that Mr. Schaefer,

Page 1018

1 Ms. Micacci, myself, took time out to
2 speak with Fred Zwick about the Shook &
3 Fletcher claim and the basis of its
4 settlement with -- First State's
5 settlement with Shook & Fletcher, and it
6 is my recollection that Mr. Zwick told us
7 that the basis of the settlement was more
8 than one, less than thousands, and was not
9 based on agreement or application of a
10 particular view on a number of
11 occurrences, but that it represented a
12 compromise between First State's best
13 outcome and the policyholder's best
14 outcome.
15 Q. And when you say more than one, but less
16 than thousands, you are referring to the
17 element of the claim that related to
18 nonproduct asbestos?
19 A. Yes. The nonproducts portion. My letter
20 indicates that First State was aggregating
21 product claims together based on the fact
22 that the various products -- that various
23 products contained asbestos. That
24 statement I'm sure is based on documents

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030   (800) 655-3663

Page 1027

1  good claim person and steward of my
2  company's money, it is just important for
3  me to see how First State went from first
4  notice to settlement. It is a simple
5  process. Every claim tells a story, and
6  all we wanted to see was the story. We
7  needed to evaluate and determine if the
8  settlement as billed to us, and we were
9  only billed the toxic tort portion, was
10 settled and allocated in accordance with
11 their claim file documentation.
12        When we went out, we looked at
13 the Safety Kleen file. I think that we
14 were not able to do that. The reason we
15 weren't able to do that is because the
16 files related to the whole settlement were
17 not made available to us. So we were
18 unable to evaluate whether or not the
19 claim as billed to us was ceded in
20 accordance with the way that it was
21 settled, and because First State had put
22 this claim into the arbitration in January
23 as part of its Exhibit C additions, it is
24 difficult for us, I think, to gather

Page 1028

1  information, and it was made difficult for
2  us to gather information. The claim files
3  were not provided.
4        In fact, in past years, First
5  State had had the question forms that we
6  were allowed to use, a blue question form,
7  that we were allowed to ask for
8  information, you know, this document is
9  referenced or that document is referenced.
10 You saw one that I had -- I don't remember
11 which claim it was -- I want to say on
12 Pulmosan -- where I asked specific
13 questions. And we weren't allowed to ask
14 questions about this. We asked where the
15 files were. We simply can't fully
16 evaluate the complex nature of the Safety
17 Kleen file without understanding the
18 nature of the pollution exposures, the
19 nature of the toxic tort exposure, the
20 nature of -- and the rationale behind the
21 way they allocated the $2 million that
22 they paid.
23 Q. So Safety -- I am sorry -- Pfizer was
24 another claim that hadn't been billed or

Page 1029

1  received by National Casualty prior to its
2  inclusion on Exhibit C in January of 2003?
3  Correct?
4  A. I believe that's correct.
5  Q. It would have been one like Safety Kleen,
6  one that was reviewed by you and
7  Mr. Myhrer in the April-May of '03 audit?
8  A. I believe that that's correct.
9  Q. Can you explain in your own words for the
10 Panel why National Casualty believes it
11 does not owe the Pfizer claim as
12 presented?
13 A. Well, Pfizer is a little bit different
14 from Safety Kleen in that it is a
15 Wellington claim, and we have paid
16 Wellington claims to First State in the
17 past, and we have paid other years on
18 Pfizer as a matter of fact. I think you
19 will find in your exhibits and your
20 documentation that I asked for a couple of
21 pieces of information, proof of payment
22 and a CCR report which demonstrated the
23 payment to the policy.
24        Subsequent to our audit in

Page 1030

1  2004 --
2  Q. 2003 you mean?
3  A. Excuse me. 2003. It is not 2004 yet.
4        -- Mr. Lagana forwarded those
5  documents to me. Eli Lilly, if I might,
6  is substantially similar in that we were
7  looking for a layoff slip for Eli Lilly.
8  It is the DES claims, and we had paid
9  other years for Eli Lilly in a DES claim,
10 and in all honesty, if these documents had
11 been provided to us in the normal course
12 of business as opposed to having First
13 State throw these two claims into
14 arbitration, the likelihood is when they
15 gave us those documents that we would have
16 paid those claims. However, First State
17 chose to have those claims adjusted in the
18 course of litigation as opposed to the
19 normal course of business. In my view, I
20 have to now look at all of these
21 documents. I have to see what they have.
22        We have had a very serious issue
23 with them over the production of documents
24 and what does inspect records for the

Page 1031

1   purpose of obtaining information mean. We
2   believe it means that you have to show us
3   the whole claim file and we're entitled to
4   have copies of anything in the file that
5   we want. We pay to have the copies made.
6   Ikon comes in. They do the copying. They
7   don't spend their staff time. They don't
8   spend their own money to make copies. We
9   pay for that. So to the extent I want
10  anything in the file, if I am willing to
11  pay for it, I think I am entitled to have
12  it.
13          One of the things we go -- one
14  of the reasons we go out to audit is just
15  for purpose of determining that they are
16  actually handling claims, that they are
17  not willy-nilly writing checks. And to be
18  honest, for the most part, we have found
19  that they handle their claims. We also
20  still think that we're entitled to have
21  these records.
22          When First State places these
23  claims as simple as a Pfizer claim, as
24  simple as an Eli Lilly, where all we

Page 1032

1   really need is a layoff slip or CCR report
2   and a proof of payment, into litigation,
3   and we go out to audit them, and files are
4   not produced or pieces of files are
5   produced or they give us a privilege log
6   that has 757 documents which are claimed
7   to be privileged and another three or four
8   hundred that are claimed to be irrelevant,
9   and I can't tell which files those things
10  go to, I can't waive my right to have that
11  access to records any longer, even for a
12  claim as simple as an Eli Lilly or as
13  simple as a Pfizer, because if I do it
14  there, I become concerned about having
15  waived my rights for other claims. I
16  become concerned about a course of conduct
17  used against me. I didn't need it there,
18  so why do I need it here? I have a right
19  to access the records. I have a right to
20  obtain information. And my view of that
21  means I have a right to have copies of
22  that information if I want it.
23          We have a disagreement about
24  what that means. It is clear that we have

Page 1033

1   a disagreement about what that means, and
2   that is part of what you people will be
3   deciding for us. I have a concern about
4   the no-show policy that I heard about the
5   first time this week and the course of
6   conduct and the material I will be allowed
7   to see in the future for claims as simple
8   as an Eli Lilly or a Pfizer, as complex as
9   an Owens Corning or Shook & Fletcher, AC&S
10  nonproducts claim. In the context of this
11  litigation, I simply cannot pay those
12  claims without being given full access to
13  all records, to inspect and obtain
14  information as I see I need it.
15  Q.  And the other claim, and the last claim,
16      that you have testimony to give concerning
17      is Eli Lilly, and unless I am mistaken,
18      you kind of explained in your last answer
19      why we have concern about that?
20  A.  Yes.
21  Q.  Okay. And the issue or discussion has
22      been had in this proceeding about whether
23      you received the layoff with the letter in
24      April, I think it was?

Page 1034

1   A.  Yes. That's correct.
2   Q.  And I think you testified at your
3       deposition that in fact those items were
4       not attached?
5   A.  That's correct. We had asked for the
6       layoff slip. In April, they forwarded a
7       letter that purported to have the policy,
8       the layoff slip, and I want to say a proof
9       of payment. You have the letter. Maybe
10      it doesn't say proof of payment, but
11      anyway, my review of that was that it was
12      not attached.
13              Now I don't have a clear
14      recollection. We went out to Boston in
15      the last two weeks of April of 2003, and
16      it may be that that letter and our audit
17      sort of coincided, that that was received
18      in our office the same time we were in
19      Boston. I didn't have it when we went to
20      Boston. I asked Mr. Lagana if he had the
21      policy and the layoff slip, and he told me
22      that it was lost, that they could not find
23      it.
24              So when I got back to the

86 (Pages 1031 to 1034)

G & M COURT REPORTERS & ASSOCIATES
(617) 338-0030   (800) 655-3663

Page 1035

1  office, when I had my first opportunity to
2  review the letter from Hartford or from
3  Willis which purported to have the policy
4  and the layoff, it wasn't there, and I was
5  told it was lost, so I had no reason
6  really to believe that it wasn't.
7      We did get a copy of it.
8  January 9th, we have a letter from
9  Mr. Lagana that says, "Here is a copy of
10 the layoff slip."
11     I would like to be able to pay
12 that claim, but in the context of this
13 litigation, given the difficulties and the
14 issues we have surrounding the inspection
15 of records clause and what that means, at
16 this point, I'm willing to allow and to
17 ask that you decide that.
18     MR. KAREKEN: I would move for
19 the introduction of this exhibit, but I
20 won't if First State is willing to agree
21 that in fact the layoff slip in question
22 was sent on January 9th by Mr. Lagana to
23 Mr. Myhrer.
24     MR. GURA: I will certainly

Page 1036

1  agree that that is -- this letter is the
2  cover sheet from Mr. Lagana to Mr. Myhrer
3  enclosing a copy of the layoff slip with
4  respect to the Eli Lilly claim and is
5  dated January 9, 2004.
6      MR. KAREKEN: Unless the Panel
7  wants a copy, we will just leave it at
8  that.
9      CHAIRMAN CASS: That is fine.
10     THE WITNESS: If I might add one
11 last thing that I would like to say.
12     Is it going to be the last?
13 Will it actually be the last?
14     MR. GURA: He doesn't even have
15 to ask the question.
16     MR. KAREKEN: I guess I have
17 become superfluous.
18     (Laughter.)
19     THE WITNESS: I would like to
20 say that in terms of Eli Lilly, Safety
21 Kleen, Pfizer, and even Pulmosan, I think
22 that the material breach of contract and
23 the lack of access to records, material
24 that we have not been provided with, is a

Page 1037

1  very valid defense to coverage under the
2  terms of these treaties.
3      MR. KAREKEN: I believe we have
4  covered all of the direct testimony of
5  Ms. Huryk, unless there was something else
6  you want to add.
7      THE WITNESS: No. I said that
8  was the last thing, and I think that is
9  the last thing I want to say.
10     MR. KAREKEN: We are done with
11 direct.
12     CHAIRMAN CASS: All right.
13     MR. GURA: I took a lot of
14 notes. You said a lot of things. I am
15 hoping to go pretty quickly.
16     CHAIRMAN CASS: Okay. Thank
17 you.
18     MR. GURA: I am sure it will be
19 made aware to me if I am not.
20     CROSS EXAMINATION
21 BY MR. GURA:
22 Q. Ms. Huryk, I would like to start by asking
23    you some questions about the audit
24    procedures --

Page 1038

1  A. Sure.
2  Q. -- at First State/Hartford. You have
3     audited both at Boston and Hartford?
4     Correct?
5  A. Yes.
6  Q. And the first time you audited, was that
7     in 2001? You can look at our chart. I am
8     not trying to trick you. It is right
9     there.
10        (Handing FS Exhibit No. 99 to
11    the witness.)
12 Q. I think from your testimony you said 2001?
13 A. That says the first time. I thought I had
14    been there earlier than that. I thought I
15    had been there in 2000, but.
16 Q. That is fine. It doesn't matter, 2000,
17    2001.
18 A. I audited with the team often and fairly
19    regularly since my employment with the
20    company.
21 Q. And you have heard Mr. Wigmanich explain
22    and describe First State's procedures
23    concerning audits and the access to and
24    production of privileged documents; isn't

87 (Pages 1035 to 1038)

Page 1039

1 that right?
2 A. Yes.
3 Q. And I think he described it as initially
4   access was given and privileged documents
5   were not produced in writing or that
6   photocopies were not made and produced to
7   reinsurers? Do you recall that?
8 A. I do recall that he said that.
9 Q. Okay. In 2001, is it your testimony that
10   you expected to receive copies of
11   privileged documents?
12 A. Yes. That was my expectation.
13 Q. That is the October-November audit?
14   Correct?
15 A. Yes.
16 Q. Obviously, you would have looked at those
17   privileged documents during that audit?
18   That is why you had that expectation?
19   Correct?
20 A. I did look at them. Yes.
21 Q. Okay.
22 A. I had a table full of material. Yes.
23 Q. And there was some discussion, and you saw
24   us all fighting, and you are familiar with

Page 1040

1   the Fred Schaefer/Bill Wigmanich report?
2 A. You mean the letter?
3 Q. Yes. The letter.
4 A. Yes.
5 Q. What is the date of that letter?
6 A. The date of the letter is April 2001.
7 Q. And this letter, that you know is an
8   exhibit here, it is First State 101, the
9   letter from Jackie Rackle to Fred
10   Schaefer --
11 A. That's correct.
12       (Handing FS Exhibit No. 101 to
13   the witness.)
14 Q. -- you have seen that?
15 A. Yes.
16 Q. This is now a letter written in response
17   to that 2001 audit in November -- October
18   and November, and she says quite clearly,
19   "As you are aware, it is our policy to
20   remove all privileged and confidential
21   documents" from the materials we sent to
22   you; correct?
23 A. That's correct. That's what that says.
24 Q. Did you ever write a letter to First State

Page 1041

1   expressing your shock and amazement at the
2   change in the policy that they are no
3   longer giving you copies of the privileged
4   and confidential documents?
5 A. I believe that in my denial letter on
6   Owens Corning I do express my shock and
7   amazement at having 500 pages of documents
8   withheld.
9 Q. That's in --
10 A. In relation to the single claim?
11 Q. Right.
12 A. Yes.
13 Q. Let's go to that. That was your January
14   -- no, no, no. I am sorry. That was your
15   January 9, 2002 letter?
16 A. That is the January 9th. It was signed by
17   Mr. Cohen, and I testified that --
18 Q. Yes. That you basically drafted it?
19 A. Yes.
20 Q. And you are from Wausau, and he signed his
21   name?
22 A. Yes.
23       CHAIRMAN CASS: What?
24       ARBITRATOR STEINLAGE: What

Page 1042

1   exhibit again is that?
2       MR. GURA: Exhibit 16.
3       ARBITRATOR STEINLAGE: I am
4   getting my exhibits mixed up. Where you
5   are referring to the denial letter? It
6   would be attached to Mark's?
7       MR. GURA: No. It is Exhibit
8   No. 16, sir.
9       MR. KAREKEN: It is also
10   included in --
11       THE WITNESS: Right. Also
12   attached to Mark's July 18th letter as
13   Exhibit 71.
14       ARBITRATOR STEINLAGE: Excuse
15   me.
16       CHAIRMAN CASS: We have got it.
17       ARBITRATOR STEINLAGE: We have
18   got it. I was looking at it from another
19   place.
20 BY MR. GURA:
21 Q. You don't say anywhere in this letter that
22   there is a change in policy from the
23   Hartford or First State? Correct?
24 A. That's correct.

88 (Pages 1039 to 1042)

Page 1063

1  Q. We can see a photocopy request form, this
2     time not from Boston, but from Hartford;
3     correct?
4  A. That's correct.
5  Q. And this is the discovery audit that you
6     participated on? Right?
7  A. That's correct.
8  Q. Okay. And as you mentioned, there was
9     some things brought in late or whatever to
10    the audit?
11 A. Yes.
12 Q. This says, "Box No. 2 shipped from
13    Boston"? Do you see that?
14 A. That's correct.
15 Q. Okay. And there is a number of documents
16    that you are writing down, and these are
17    the documents that you looked at, correct,
18    during that audit? That is what you are
19    writing here? You want copies of
20    documents that you see during the audit?
21    Right?
22 A. Yes.
23 Q. Okay. And one of them is this Bowman to
24    file, Hartford, OC analysis, do you see

Page 1064

1     that, of exhaustion?
2  A. Yes.
3  Q. There is certainly some other things,
4     "Dolin to Bowman, why Hartford owes policy
5     products. Prior to OC Chapter 11 filing.
6     Roach to Hofer. New DJ checklist. OC's
7     trial brief." Do you see that?
8  A. Yes.
9  Q. Turn two pages in front, I think that is
10    1573 on the top, that is the HEF legal
11    file that you were looking at when you
12    were there; is that right?
13 A. That's correct.
14 Q. Letters concerning nonproduct and claim
15    info, highlights of various meetings,
16    overview of the settlement, OC creditors,
17    changes to notice recipients, do you see
18    that?
19 A. Yes, I do. Whatever is there. There is a
20    blue file, various files.
21 Q. I am trying to point out various
22    documents. I am going to read them
23    quickly. This is what you saw?
24 A. Yes. I agree. I saw these.

Page 1065

1  Q. Okay. Thank you. If you go back then to
2     the next page, which is 1574, Bowman to
3     Reilly, Bowman to Reilly, Dolin to Bowman,
4     Bowman to Kubas, Bowman to Reilly, e-mail,
5     e-mail re: settlement proposal, Bowman to
6     Kubas, Mnookin to Bowman, Bowman to file.
7        Do you see all of those various
8     things? And I'm not going to go through
9     more, but basically, these are the
10    materials that you looked at. The Panel
11    can go through this to see what you looked
12    at. These are the documents that you
13    looked at during your audit; correct?
14 A. These are documents that were put in a
15    box, shipped to us from Boston. They came
16    to us on the 19th. We got a chance to
17    look at them on the 20th. We were looking
18    at a variety of things during that. We
19    were given only the one week to do
20    document discovery. To say that we saw
21    these in the box that was sent to us is
22    true, but to suggest that we had an
23    opportunity to review and analyze all of
24    these documents would not be a true

Page 1066

1     statement.
2  Q. Okay. I just want to make sure it is
3     clear.
4  A. As long as we are clear on that.
5  Q. I understand your position. I just want
6     to make clear the types of materials that
7     were in the boxes that were provided to
8     you, because I think there may be some
9     question as to that. I want to make sure
10    it is clear to the Panel what the types of
11    materials were that were in those boxes.
12       If you go on to the next page,
13    it looks like 1576, you will see there is
14    an exhaustion analysis, Bowman to Kubas,
15    Bowman to Kelly. And if you go to the
16    next page, there is more, Bowman to file,
17    and other things. I am not going to go
18    through all of these. Okay.
19       MR. GURA: I would also like you
20    to look at some of your 2001 audit request
21    forms.
22       (Mr. Gura handing documents to
23    the Panel, counsel and the witness.)
24       MR. GURA: This is FS 105.

94 (Pages 1063 to 1066)